Donald A. KURZ and Sems Diversified
Value, LP, Plaintiffs,

v.

James L. HOLBROOK, Jr.,
et al., Defendants.

James L. Holbrook, Jr., et al.,
Counterclaim Plaintiffs,

v.

Donald A. Kurz and Sems Diversified
Value, LP, Counterclaim
Defendants,

and

James L. Holbrook, Jr., et al.,
Third–Party Plaintiffs,

v.

Take Back EMAK, LLC, Third–
Party Defendants,

Crown EMAK Partners, LLC,
Counterclaim and Third–
Party Plaintiff,

v.

Donald A. Kurz, et al., Counterclaim
and Third–Party Defendants.

C.A. No. 5019–VCL.

Court of Chancery of Delaware.

Submitted: Feb. 4, 2010.
Decided: Feb. 9, 2010.

Andre G. Bouchard, Esquire, David J. Margules, Esquire, Joel Friedlander, Esquire, Sean M. Brennecke, Esquire, Bouchard Margules & Friedlander, P.A., Wilmington, DE, for Plaintiffs Donald A. Kurz, Sems Diversified Value, LP, Lloyd M. Sems, Philip S. Kleweno, Michael Konig and Take Back EMAK, LLC.

Stephen E. Jenkins, Esquire, Catherine A. Gaul, Esquire, Andrew D. Cordo, Esquire, Peter Faben, Esquire, Ashby & Geddes, Wilmington, DE; Steven K. Talley, Esquire, Gibson, Dunn & Crutcher LLP, Denver, CO; Jeremy W. Stamelman, Esquire, Gibson, Dunn & Crutcher LLP, Los Angeles, CA, for Defendant and Counterclaim and Third–Party Plaintiff Crown EMAK Partners, LLC and Defendants Jeffery Deutschman and Jason Ackerman.

William O. LaMotte, III, Esquire, Kenneth J. Nachbar, Esquire, Christine D. Haynes, Esquire, Shannon E. German, Esquire, Morris Nichols Arsht & Tunnell LLP, Wilmington, DE; Thad A. Davis, Esquire, Ropes & Gray LLP, San Francisco, CA, for Defendants EMAK Worldwide, Inc. and James L. Holbrook, Jr.

Collins J. Seitz, Jr., Esquire, Bradley Aronstam, Esquire, Connolly, Bove, Lodge & Hutz LLP, Wilmington, DE, for Defendants Stephen P. Robeck, Howard D. Bland and Jordan H. Rednor.

## OPINION

LASTER, Vice Chancellor.

This post-trial opinion resolves competing requests for relief under Section 225 of the Delaware General Corporation Law (the "DGCL"). 8 Del. C. § 225. At stake is control of the board of directors (the "Board") of EMAK Worldwide, Inc. ("EMAK" or the "Company").

Prior to December 18, 2009, the Board had six directors and one vacancy. On December 18, one director resigned, creating a second vacancy. The plaintiffs contend that on December 20 and 21, Take Back EMAK, LLC ("TBE") delivered sufficient consents (the "TBE Consents") to

remove two additional directors without cause and fill three of the vacancies with Philip Kleweno, Michael Konig, and Lloyd Sems. Incumbent director Donald Kurz is a member of TBE. The TBE Consents, if valid, would establish a new Board majority.

The defendants contend that on December 18, 2009, Crown EMAK Partners, LLC ("Crown") delivered sufficient consents (the "Crown Consents") to amend EMAK's bylaws in two important ways. First, the Crown Consents purportedly amended Section 3.1 of the bylaws ("New Section 3.1") to reduce the size of the Board to three directors. Because Crown has the right to appoint two directors under the terms of EMAK's Series AA Preferred Stock, reducing the board to three, if valid, would give Crown a Board majority. Second, the Crown Consents purportedly added a new Section 3.1.1 to the bylaws ("New Section 3.1.1") providing that if the number of sitting directors exceeds three, then the EMAK CEO will call a special meeting of stockholders to elect the third director, who will take office as the singular successor to his multiple predecessors. The defendants contend that the bylaw amendments are valid and that the next step is for the EMAK CEO to call a special meeting.

I hold that the bylaw amendments adopted through the Crown Consents conflict with the DGCL and are void. They were therefore ineffective to shrink the Board or to require the calling of a special meeting. I hold that the TBE Consents validly effected corporate action. The Board therefore consists of incumbent directors Kurz, Jeffrey Deutschman, and Jason Ackerman, and newly elected directors Kleweno, Konig, and Sems. One vacancy remains.

In addition to seeking relief under Section 225, the parties have asserted a pano-ply of claims, cross-claims, and third-party claims, and they have amassed an extensive record relating to those claims. My decision addresses only the requests for relief under Section 225, and I have sought to avoid resolving factual disputes that could have collateral implications if the other claims proceed. Contemporaneously with the issuance of this opinion, I am entering a partial final judgment under Rule 54(b) to implement my decision, thereby facilitating a prompt appeal should the defendants wish to pursue it.

## I. FACTUAL BACKGROUND

I recount the facts as proven at trial by a preponderance of the evidence. The burden of proof rested on the plaintiffs. The parties commendably stipulated to a number of facts in the pre-trial order.

### A. EMAK's Capital Structure

EMAK is a Delaware corporation based in Los Angeles, California. EMAK has two classes of stock: common shares and the Series AA Preferred Stock.

EMAK has issued and outstanding 7,034,322 shares of common stock. EMAK's common shares traded on NASDAQ from 1994 until April 14, 2008, when trading was suspended. On June 17, 2008, EMAK was delisted. EMAK subsequently deregistered, although its common shares continue to trade on the pink sheets.

EMAK has issued and outstanding 25,000 shares of Series AA Preferred Stock, all held by Crown. The Series AA Preferred has the right to elect two directors to the Board, plus a third director if the Board expands to more than eight members. The Series AA Preferred does not vote in the election of directors. It votes on an as-converted basis with the common stock on all other matters. The Series AA

Preferred can convert into 2,777,777 common shares and carries 27.6% of EMAK's total voting power on matters where it votes with the common stock.

## B. The TBE Consent Solicitation And The Exchange Transaction

On Monday, October 12, 2009, TBE delivered an initial consent to EMAK, thereby launching its consent solicitation (the "TBE Consent Solicitation"). Under Section 2.13(c) of EMAK's bylaws (the "Bylaws"), the Board had the power to set a record date for the TBE Consent Solicitation. During a meeting on October 19, the Board set October 22 as the record date. Had the Board not exercised its authority, the record date would have been October 12, the date of delivery of the initial TBE Consent.

At the October 19 meeting, the Board also approved a transaction pursuant to which Crown exchanged its Series AA Preferred for new Series B Preferred Stock (the "Exchange Transaction"). Unlike the Series AA Preferred, the Series B Preferred voted on an as-converted basis with the common stock on all matters, including the election of directors. The Exchange Transaction thus conferred on Crown the right to wield 27.6% of the total voting power in an election of directors. The October 22 record date enabled EMAK to get the new Series B Preferred into Crown's hands for the TBE Consent Solicitation.

On October 26, 2009, the plaintiffs filed suit challenging the Exchange Transaction and sought an expedited hearing on an application for preliminary injunction. During the scheduling conference, the parties agreed that the deadline for delivering consents in the TBE Consent Solicitation would be December 21, and I entered an order implementing that agreement. I granted the motion to expedite and sched-uled a hearing on the plaintiffs' injunction application for December 4.

To bolster the defendants' litigation position, EMAK solicited consents to ratify the Exchange Transaction (the "Ratification Solicitation"). I did not have to rule on either the Exchange Transaction or the ratification strategy because on December 3, 2009, the day before the hearing, EMAK and Crown rescinded the Exchange Transaction.

The plaintiffs responded to the rescinding of the Exchange Transaction by filing an amended complaint challenging the disclosures made in the Ratification Solicitation. On December 7, 2009, the individual defendants and EMAK filed counterclaims and a third party complaint challenging the disclosures made in the TBE Consent Solicitation. On December 8, the parties agreed to defer any interim litigation over their disclosures and fight it out at the ballot box. They agreed to resume any litigation on December 22, after the deadline for the TBE Consent Solicitation.

## C. Three Consent Solicitations At Once

During December 2009, solicitation activity intensified with three consent solicitations under way. TBE continued its solicitation activities and issued a series of press releases and public statements in support of the TBE Consent Solicitation. On December 7, EMAK began soliciting consent revocations and issued a series of press releases and public statements in support of its efforts.

Crown joined the fray. After the rescission of the Exchange Transaction, Crown designated Jason Ackerman as the second director authorized by the Series AA Preferred Stock. Crown also began soliciting consents to amend the Bylaws in the following manner:

RESOLVED: Article III, Section 3.1 of the Company's Bylaws is amended to read as follows:

Section 3.1. Number and Term of Office. The Board of Directors shall consist of three members. As provided for in the Amended and Restated Certificate of Designation of the Series AA Senior Cumulative Convertible Preferred Stock, two directors shall be elected by the holders of the Series AA Senior Cumulative Convertible Preferred Stock. The directors shall be elected at the annual meeting of the stockholders, except as provided elsewhere in this Article III, and each director elected shall hold office until his successor is elected and qualified. Directors need not be stockholders, residents of Delaware, or citizens of the United States.

RESOLVED: Article III, Section 3.1.1 is added to the Company's Bylaws:

Section 3.1.1 If at any time the number of members of the Board of Directors shall be greater than three, unless a sufficient number of directors resign to reduce the number of members of the Board of Directors to three, the Chief Executive Officer shall promptly call a special meeting of the common stockholders of the Corporation, which meeting shall be held not later than 20 days following the first date on which the number of directors was greater than three (or in the case of the adoption of the bylaw establishing a three-member Board of Directors, 20 days after such bylaw amendment became effective), for purposes of electing the one director to be elected by the common stockholders of the Corporation, who shall be the successor to all directors previously elected by the common stockholders of the Corporation.

I refer to these provisions as the "Bylaw Amendments."

## D. The Roles Of DTC And Broadridge In The TBE Consent Solicitation

TBE conducted a broad-based solicitation in which it sought to obtain consents from a large number of individual EMAK stockholders. Unsurprisingly for a corporation that was publicly traded for some fourteen years, a significant number of EMAK stockholders own their shares in street name. Although this concept is doubtless familiar to many readers, I offer a brief summary from a leading treatise:

> The vast majority of publicly traded shares in the United States are registered on the companies' books not in the name of beneficial owners—i.e., those investors who paid for, and have the right to vote and dispose of, the shares—but rather in the name of "Cede & Co.," the name used by The Depository Trust Company ("DTC").

> Shares registered in this manner are commonly referred to as being held in "street name." ... DTC holds the shares on behalf of banks and brokers, which in turn hold on behalf of their clients (who are the underlying beneficial owners or other intermediaries).

John C. Wilcox, John J. Purcell III, & Hye–Won Choi, *"Street Name" Registration & The Proxy Solicitation Process*, at 10–3 *in* Amy Goodman, *et al.*, *A Practical Guide to SEC Proxy and Compensation Rules* (4th Ed. 2007 & 2008 Supp.) (hereinafter *"Street Name"*).

DTC figures prominently in this case. So does the Investor Communications Solutions Division of Broadridge Financial Services, Inc. ("Broadridge"). Although Broadridge's role is also likely familiar to many readers, I again offer a quick summary:

For many years, banks and brokers maintained their own proxy departments to handle the back-office administrative processes of distributing proxy materials and tabulating voting instructions from their clients. Today, however, the overwhelming majority have eliminated their proxy departments and subcontracted these processes out to [Broadridge]. For many years, these proxy processing services were provided by Automatic Data Processing, Inc. ("ADP"), but on March 31, 2007, ADP spun off its Brokerage Services Group into a new independent company, Broadridge, which now provides these services to most banks and brokers.

To make these arrangements work, Broadridge's bank and broker clients formally transfer to Broadridge the proxy authority they receive from DTC (via the [DTC] Omnibus Proxy) via written powers of attorney. On behalf of the brokers and banks, Broadridge delivers directly to each beneficial owner a proxy statement and, importantly, a voting instruction form (referred to as a "VIF") rather than a proxy card. Beneficial owners do not receive proxy cards because they are not vested with the right to vote shares or to grant proxy authority—those rights belong only to the legal owners (or their designees). Beneficial owners merely have the right to instruct how their shares are to be voted by Broadridge (attorney-in-fact of the DTC participants), which they accomplish by returning a VIF.

*Id.* at 10–14. As this summary notes, DTC is generally understood to be the entity with the power under Delaware law to vote the shares that it holds on deposit for the banks and brokers who are members of DTC. Through the DTC omnibus proxy, DTC transfers its voting authority to the banks and brokers. The banks and brokers then transfer the voting authority to Broadridge, which votes the shares held at DTC by each bank and broker in proportion to the aggregate instructions received from the ultimate beneficial owners.

For the TBE Consent Solicitation, Broadridge collected, recorded, and totaled the voting instructions it received from the beneficial owners of EMAK shares held in street name. There is no dispute that the banks and brokers properly authorized Broadridge to vote the EMAK shares held on their behalf at DTC.

What no one ever obtained, and what DTC never provided, was the DTC omnibus proxy. The evidence conflicts as to who had the responsibility to get the DTC omnibus proxy. As I discuss in the Legal Analysis, there is no legal authority—*none*—addressing this subject. The lead inspector of elections from IVS Associates, Inc. ("IVS"), currently the preeminent independent inspector of elections for contested solicitations, understood that EMAK was obligated to obtain the DTC omnibus proxy. The IVS engagement letter with EMAK provided for EMAK to obtain the DTC omnibus proxy. DTC only would have issued an omnibus proxy to EMAK, not to an insurgent, and TBE could only have obtained a copy from EMAK through a demand for a stocklist under Section 220 of the DGCL, 8 *Del. C.* § 220.

The proxy solicitors for TBE and EMAK each testified to a general understanding in their industry that if an issuer solicits proxies for a meeting of stockholders or conducts a consent solicitation, then the issuer gets the DTC omnibus proxy because it is the issuer's solicitation. Both proxy solicitors believed that if an insurgent launches a *consent* solicitation, then the insurgent should get the DTC omnibus proxy because it is the insurgent's solicitation. This "rough justice" rationale does

not extend to an insurgent-initiated *proxy* solicitation, because a meeting of stockholders is always viewed as the company's meeting.

I do not believe the "rough justice" rationale fits how the DTC omnibus proxy is generated. Peering into the murk, it appears to me that even when a company holds a meeting or solicits consents, there is no legal obligation for the company to obtain the DTC omnibus proxy, nor any legal mechanism for the company to compel its issuance. The company thus does not "get" the DTC omnibus proxy, even under these circumstances. Instead, under the federal securities laws, an issuer must work with DTC to locate and communicate with the ultimate beneficial owners of its shares. Through this process, DTC learns of the record date and issues the DTC omnibus proxy as a matter of course. It just happens.

Given the lack of authority to govern this foggy area, the parties can each claim that the other failed to get the DTC omnibus proxy. There is blame enough to go around. TBE's proxy solicitor, D.F. King, took the initial steps that ordinarily would result in DTC issuing an omnibus proxy, but then assumed it would happen and failed to follow up. EMAK agreed with IVS to provide the DTC omnibus proxy and twice took actions from which an obligation to get the DTC omnibus proxy might be implied, first when the Board opted to set the record date for the TBE Consent Solicitation, and second when EMAK chose to solicit consent revocations. There are also disputes over events on the last day of the TBE Consent Solicitation, when IVS advised EMAK that it did not have a DTC omnibus proxy. The plaintiffs contend that EMAK's general counsel improperly delayed informing TBE until it was too late for DTC to issue an omnibus proxy. EMAK responds with evidence

that the officer acted diligently and in good faith.

According to the old adage, "where there's smoke, there's fire." I view the considerable smoke generated by these factual disputes as evidence of a fire of legal indeterminacy surrounding the DTC omnibus proxy. I address this subject in the Legal Analysis, *infra*. For present purposes, I decline to wade into the factual fog and apportion either responsibility or fault. Having weighed the evidence, I find that neither party clearly had the obligation to get the DTC omnibus proxy and both could have done more, but neither acted improperly or inequitably with respect to this aspect of the case.

## E. The Delivery Of The Consents

On December 18, 2009, Crown delivered the Crown Consents to EMAK along with a certification required by Section 2.13(e) of the Bylaws attesting to Crown's good-faith belief that Crown had received sufficient consents to take corporate action. With the nearly 28% voting power that Crown could wield on matters other than the election of directors, Crown needed only another 23% to reach the necessary majority of EMAK's outstanding voting power. Crown obtained it from EMAK management and one large institutional holder. With only a few consents to deliver, Crown sidestepped the need for a DTC omnibus proxy by having DTC execute the consents in the name of Cede, a procedure DTC offers to beneficial holders akin to the issuance of appraisal demands in Cede's name. This approach is not practical for a broad-based solicitation such as TBE conducted.

Meanwhile, with the December 21, 2009, deadline looming, TBE and its principals were working feverishly to round up the final consents. On Thursday, December

17, Sems emailed Kurz: "We need to buy someone['s] shares this weekend."

One of the individuals whose vote remained up in the air was Peter Boutros, a former employee and current consultant of EMAK who lives in Australia. Boutros owned 175,000 shares of restricted stock, all entitled to vote. Both sides sought Boutros's support. On Thursday, December 17, 2009, Boutros told Kurz that he would vote for Crown. Kurz responded that he would reach out to Boutros that weekend and encouraged Boutros to reconsider before the December 21 deadline.

As of Friday, December 18, 2009, D.F. King showed TBE with consents for approximately 48.4% of the common shares. To prevail, TBE needed another 116,325 votes.

Between Friday, December 18 and Sunday, December 20, 2009, Kurz had a series of calls with Boutros. On Sunday, Kurz had additional calls with Boutros's counsel. The result was a Purchase Agreement dated as of December 20, 2009 (the "Purchase Agreement"), pursuant to which Boutros sold to Kurz:

> (a) all shares of common stock of EMAK Worldwide, Inc., a Delaware corporation (the "Company") that Seller owns and is entitled or permitted to sell, transfer or assign as of the date hereof (the "Shares"), and (b) all rights to receive all other shares of the Company that the Seller is or may hereafter be entitled or permitted to sell, transfer or assign, for a total purchase price of U.S. $225,000.00 (the "Purchase Price"), with the Purchase Price to be paid by wire transfer to an account designated by Seller upon full execution of this Agreement.

Boutros originally asked for $2.25 per share. Kurz felt that was too high and bargained Boutros down. Kurz believed he obtained the economic and voting rights

(albeit not legal title) to 150,000 shares, resulting in a price of $1.50 per share. At the time, EMAK's stock was trading on the pink sheets for around $0.95 per share.

The odd framing of what Boutros sold and Kurz bought reflects their efforts to contract around transfer restrictions. A Restricted Stock Grant Agreement dated March 3, 2008, governed 150,000 of Boutros's shares. Section 2 of that agreement provided: "Prior to [March 3, 2011], [Boutros] shall not be entitled to transfer, sell, pledge, hypothecate or assign any shares of Restricted Stock." Under Section 3 of that agreement, if Boutros was still employed by EMAK on March 3, 2011, then the transfer restrictions would lapse. If he was terminated without cause before March 3, 2011, then the restrictions would lapse upon termination. If he was terminated for cause or resigned before March 3, 2011, then he would forfeit the shares. The cover letter from EMAK that conveyed the grant stated: "The stock will vest equally (one-third per year) over a three year period." But this was an odd use of the term "vest," because under Section 2, the transfer restrictions and forfeiture provisions purportedly applied to *all* 150,000 shares until March 3, 2011.

Boutros's remaining 25,000 shares were governed by a Resale Restriction Agreement dated November 6, 2009. It contains a different form of transfer restriction, which provides: "[Boutros] agrees not to sell, contract to sell, grant any option to purchase, transfer the economic risk of ownership in, make any short sale of, pledge or otherwise transfer or dispose of any Shares (or any interest in any Shares) until the Shares have been released from the foregoing restrictions [on or before November 7, 2010]."

Kurz was provided with copies of both agreements on Sunday, December 20,

2009, prior to entering into the Purchase Agreement. Kurz read the agreements and parsed the restrictions. He focused on the language in the Resale Restriction Agreement that extended beyond any sale to encompass any "contract to sell," any "option to purchase," and any transfer of the "economic risk of ownership." He noted that the Restricted Stock Grant Agreement did not contain similar language and appeared to restrict only an actual sale, transfer, pledge, hypothecation, or assignment. Kurz concluded that he could contract with Boutros to buy however many shares Boutros could sell at the time and to obtain in the future however many shares Boutros eventually could transfer, if and when Boutros became able to transfer them.

The parties dispute what was actually transferred. Of the shares governed by the Restricted Stock Grant Agreement, the plaintiffs contend Boutros could transfer 50,000 shares immediately, another 50,000 on March 3, 2010, and the final 50,000 on March 3, 2011. The defendants contend Kurz got nothing and 150,000 shares if Boutros still holds them on March 3, 2011. For purposes of this opinion, I assume the latter to be true.

Section 2 of the Purchase Agreement was critical to Kurz. It provides:

> **Proxies.** As a material part of the consideration for this Agreement, and an express condition precedent to the effectiveness hereof, Seller agrees to execute and deliver to Buyer by facsimile transmittal on the date hereof, time being of the essence, with originals to follow immediately by express delivery, (a) this Agreement, (b) an Irrevocable Proxy, (c) the Revocation, and (d) the White Consent Card solicited by Take Back EMAK, LLC, each in the form attached hereto.

With Boutros's votes in hand, Kurz believed TBE had the consents it needed to prevail.

Late in the evening on December 20, 2009, Kurz's counsel sent by email to EMAK's general counsel an initial Broadridge omnibus consent dated November 23, 2009, reflecting voting instructions received through that date (the "Initial Broadridge Omnibus Consent"). Kurz's counsel also sent written consent cards for record holders and a certification attesting to the soliciting parties' good faith belief that they had received valid and unrevoked consents sufficient to take corporate action. The defendants question whether Kurz, TBE, and the other soliciting parties could have held that good faith belief on December 20. I find that the certification was properly given based on the consents TBE had in hand and the information they had from their proxy solicitor about how the street-name vote came in.

On the morning of December 21, 2009, the same documents were hand-delivered to EMAK's registered office in Delaware. That morning, TBE ordered a supplemental omnibus consent from Broadridge dated December 21, 2009 (the "Supplemental Broadridge Omnibus Consent"), showing additional votes, net of revocations, since November 23. The Supplemental Broadridge Omnibus Consent was hand-delivered to EMAK's registered office later that day. TBE also delivered additional consent cards from registered holders to EMAK's registered office.

## F. The IVS Reports

On December 21, 2009, IVS issued its preliminary tabulation report on the Crown Consents. IVS reported that Crown delivered consents representing 50.89% of EMAK's outstanding voting power, sufficient to amend the Bylaws. On December 23, EMAK informed IVS

that it was not challenging the preliminary tabulation report. That same day, IVS issued its final report confirming its preliminary tally.

On December 23, 2009, IVS issued its preliminary tabulation report on the TBE Consents. IVS reported that record holders of 2,496,598 shares expressed consent in favor of the TBE Consent Solicitation and that street name holders of 1,055,815 shares consented through the Broadridge omnibus consents. The combined tally of 3,552,413 shares represented a majority of the 7,034,322 common shares outstanding on the record date. The IVS preliminary report, however, treated the street votes as "invalid due to the lack of a DTC omnibus proxy on file."

On January 14, 2010, TBE delivered a written challenge to the IVS preliminary report. TBE contended that (i) the consents for shares held in street name should be counted and (ii) the tally in favor of TBE should include additional consents delivered on December 21, 2009.

On January 15, 2010, IVS issued its final report. IVS revised its tally to take into account consent cards delivered on December 21, 2009. IVS now reported that record holders of 2,502,032 shares expressed consents in favor of the TBE Consent Solicitation. IVS declined to count the street-name consents.

As of October 22, 2009, EMAK had 7,034,322 shares outstanding. In order to prevail, TBE needed to obtain consents for 3,517,162 shares (50% + 1). Backing out the consents for 2,502,032 shares that TBE received from record holders leaves a balance of 1,015,130 votes required for victory.

The IVS preliminary report showed that TBE received consents from street-name holders of 1,055,815 shares, which is more than sufficient. Table A shows for each proposal (i) the votes received by TBE through the Initial Broadridge Omnibus Consent and (ii) the additional votes, net of revocations, received by TBE through the Supplemental Broadridge Omnibus Consent. On each issue, the Broadridge omnibus consents provided TBE with sufficient votes from shares held in street name for TBE to prevail.

## TABLE A

| Issue | Initial Broadridge Omnibus Consent | Supplemental Broadridge Omnibus Consent | Total |
|---|---|---|---|
| Removal of incumbent directors | 1,055,815 | 3,144 | 1,058,959 |
| Elect Kleweno | 1,055,965 | 4,634 | 1,060,599 |
| Elect Konig | 1,055,965 | 2,287 | 1,058,252 |
| Elect Sems | 1,055,965 | 2,287 | 1,058,252 |

But there is one more step in the process. The sequence of events at the beginning of the TBE Consent Solicitation created some confusion about the record date. Recall that TBE first delivered a consent that would have set October 12, 2009, as the record date, but then the Board exercised its authority to set the record date for October 22. The Broadridge omnibus consents reflected an incorrect record date of October 12. As I discuss in the Legal Analysis, a consent need not identify the record date, and the fact that Broadridge included an incorrect piece of extraneous information on its omnibus consents does not affect their validity.

It is necessary, however, to review the number of shares voted by the Broadridge omnibus consents and count only the number of shares actually owned by the banks and brokers on the true record date of October 22, 2009. If DTC holds shares of a corporation on behalf of banks and brokers, then the corporation can ask DTC to provide what is technically known as a participant listing and informally referred to as a "Cede breakdown." The Cede breakdown for a particular date identifies by name each bank or broker that holds shares with DTC as of that date and the number of shares held. In contrast to the DTC omnibus proxy, which is not governed by any legal authority, federal regulations require DTC to furnish a Cede breakdown promptly when a corporation requests it.

Lawrence E. Dennedy, whom the defendants proffered as an expert on consent solicitations, testified about the Cede breakdown and the DTC omnibus proxy. Dennedy is Executive Vice President of MacKenzie Partners, Inc., a proxy solicitation firm that is one of the premier providers of services in contested situations. Dennedy has worked for MacKenzie since 1995. Prior to that, he spent twenty-six years working for a major financial institution in their shareholder services department, eventually heading up the department. He has personally participated in hundreds of uncontested solicitations, dozens of contested proxy solicitations, and approximately six contested consent solicitations. Contested consent solicitations are much rarer than contested proxy solicitations, and MacKenzie itself typically works on only about two a year. MacKenzie acted as EMAK's proxy solicitor for soliciting revocations, and Dennedy

testified as both a fact and expert witness. I found Dennedy to be thoroughly knowledgeable and qualified as an expert. His testimony was credible and candid.

Dennedy testified that the position listing information provided by a Cede breakdown for a given date is identical to the position listing that would appear on a DTC omnibus proxy issued for that record date. He explained that an inspector of elections will count all of the votes on the face of a Broadridge proxy or omnibus consent for a given bank or broker if the number of shares listed on the DTC omnibus proxy or Cede breakdown is the same as or greater than the number of votes. He further explained if a Broadridge proxy or omnibus consent for a given bank or broker shows more votes than the number of shares listed on the DTC omnibus proxy or Cede breakdown, and there are no conflicting proxies or consents, then the inspector of elections will cutback the overvote to the number of shares listed on the DTC omnibus proxy or Cede breakdown. IVS recognized the propriety of such an adjustment.

In November 2009, EMAK obtained Cede breakdowns for both October 12 and October 22. The Cede breakdowns show the aggregate decline in the share positions of each of the thirty-one banks and brokers who held EMAK shares through DTC. The total reduction is 29,386 shares, less than the margin of victory on each issue. The same calculation can be derived by cutting back the overvote on a broker-by-broker basis. Assuming conservatively that TBE lost a consent for each share by which the position of a consenting bank or broker declined, then TBE still prevailed. Table B shows the calculations.

**TABLE B**

| | Total Street Votes | Total Votes After | Margin of Victory |
|---|---|---|---|

| Issue | From Broadridge Omnibus Consents | Reduction of 29,386 Shares | Based On 1,015,130 Street Votes Needed |
|---|---|---|---|
| Removal of incumbent directors | 1,058,959 | 1,029,573 | 14,443 |
| Elect Kleweno | 1,060,599 | 1,031,213 | 16,083 |
| Elect Konig | 1,058,252 | 1,028,866 | 13,736 |
| Elect Sems | 1,058,252 | 1,028,866 | 13,736 |

I thus find as a factual matter that if all of the TBE Consents are counted, including the street votes from the Broadridge omnibus consents, then TBE delivered sufficient consents to EMAK to take corporate action.

## II. LEGAL ANALYSIS

My task is to determine whether either the Crown Consents or the TBE Consents validly effected corporate action. It is not my place to assess the relative merits of the competing factions who seek to control the EMAK Board, nor to evaluate the qualifications or fitness of the individual candidates. Those decisions are for the stockholders. *In re Gulla,* 115 A. 317, 318 (Del.Ch.1921).

## A. The Bylaw Amendments Are Invalid.

 The Crown Consents are ineffective because they purported to amend the Bylaws in a manner that conflicts with the DGCL. Section 109(b) of the DGCL provides that the bylaws of a Delaware corporation "may contain any provision, not inconsistent with law or with the certificate of incorporation, relating to the business of the corporation, the conduct of its affairs, and its rights or powers or the rights or powers of its stockholders, directors, offi-cers or employees." 8 *Del. C.* § 109(b). A bylaw provision that conflicts with the DGCL is therefore void.

Through the Bylaw Amendments, Crown tried to shrink the Board's size below the number of currently sitting directors—metaphorically pulling their seats out from under them. Typically in a contested election, an insurgent first removes the challenged directors, then reduces the number of directorships, and then fills the vacancies.[1] Crown did not follow this traditional route because Crown could not vote the Series AA Preferred to remove directors. Under Section 141(k) of the DGCL, subject to exceptions not relevant here, shares only can vote to remove directors if they can vote to elect directors. 8 *Del. C.* § 141(k) ("Any director or the entire board of directors may be removed, with or without cause, by the holders of a majority of the shares then *entitled to vote at an election of directors....*") (emphasis added). The Series AA Preferred does not vote to elect directors and consequently cannot vote to remove directors.

Crown's inability to wield the Series AA Preferred's nearly 28% voting power rendered a campaign to remove directors decidedly unattractive. In such a contest, Crown would face the same daunting task as Kurz: obtaining consents from diffuse

---

1. *See, e.g., Waggoner v. Laster,* 581 A.2d 1127, 1129–30 (Del.1990) (describing effort by written consent to remove board, reduce size of board, and elect new directors); *Kalageorgi v. Victor Kamkin, Inc.,* 750 A.2d 531, 536 (Del. Ch.1999) (describing effort by written consent to remove directors and then reduce size of board); *AGR Halifax Fund, Inc. v. Fiscina,* 743 A.2d 1188, 1191 (Del.Ch.1999) (describing effort by written consent to remove directors, reduce size of board, and elect new directors).

holders of over 50% of the common stock of a deregistered, poorly performing, micro-cap corporation. On an issue where the Series AA Preferred could vote, however, Crown only needed to round up support from holders of 22% of the common shares. Management and one of EMAK's institutional holders could (and did) deliver the vote.

Crown's board-reduction tactic has a statutory hook. Section 141(b) of the DGCL provides that: "The number of directors shall be fixed by, or in the manner provided in, the bylaws, unless the certificate of incorporation fixes the number of directors, in which case a change in the number of directors shall be made only by amendment of the certificate...." 8 *Del. C.* § 141(b). The EMAK charter does not fix the number of directors, which instead is addressed in Section 3.1 of the Bylaws. The defendants are thus correct that stockholders exercising a majority of EMAK's outstanding voting power, including the Series AA Preferred, can alter the size of the Board through a bylaw amendment.

If the size of the board is increased, then the DGCL speaks to what happens with the new seats. Under Section 223(a)(1), unless otherwise specified in the certificate of incorporation or bylaws, "newly created directorships resulting from any increase in the authorized number of directors elected by all of the stockholders having the right to vote as a single class may be filled by a majority of the directors then in office, although less than a quorum...." 8 *Del. C.* § 223(a)(1). Although EMAK's charter is silent, Section 3.2 of the Bylaws contemplates that the Board may fill newly created directorships. Newly created directorships also may be filled by stockholders. *Moon v. Moon Motor Car Co.*, 151 A. 298, 302 (Del.Ch.1930).

Our law has not addressed what happens when a bylaw amendment would shrink the number of board seats below the number of sitting directors. The DGCL does not address it. No Delaware court has considered it. None of the leading treatises on Delaware law mention it.[2] Indeed, no one seems to have contemplated it.

New Section 3.1 would shrink the Board to three directorships at a time when five directors are in office. There are two possible consequences for the suddenly surplus directors. One is that their terms would end. The other is that they would continue to serve, albeit without official seats, until their terms were ended by a statutorily recognized means. I find that both possibilities conflict with the DGCL.

The notion that the terms of the extra directors would end conflicts with Section 141(b)'s mandate that "[e]ach director shall hold office until such director's successor is elected and qualified or until such director's earlier resignation or removal." 8 *Del. C.* § 141(b). Section 141(b) thus recognizes three procedural means by which the term of a sitting director can be brought to a close: (1) when the director's successor is elected and qualified, (2) if the director resigns, or (3) if the director is removed. Section 141(b) does not contemplate that a director's term could end through board shrinkage. A bylaw that

---

**2.** *See* 1 R. Franklin Balotti & Jesse A. Finkelstein, *The Delaware Law of Corporations & Business Organizations* § 4.2 ("Number of Directors") (3d ed. & 2010 Supp.); 1 David A. Drexler *et al., Delaware Corporate Law and Practice* §§ 13.01[2] ("Number of Directors") & 13.01[3] ("Term of Office") (2009); Edward P. Welch, *et al., Folk on the Delaware General Corporation Law* §§ 141.3 ("Number of directors") & 141.5 ("Terms of directors and related matters") (5th ed. 2006 & 2010 Supp.).

seeks to achieve this result conflicts with Section 141(b) and is void.

This interpretation of Section 141(b) comports with how our law has developed. Under the common law, "the voluntary assumption of management responsibility by the directors carried with it a concomitant vested right to serve out the full term for which they were elected unless there was cause for removal. . . ." Drexler, *supra*, § 13.01, at 13–2; *see Roven v. Cotter*, 547 A.2d 603, 608 (Del.Ch.1988) ("At common law a director had a vested right in his position arising from his duties and responsibilities to the corporation."); *see also Campbell v. Loew's, Inc.*, 134 A.2d 852, 857 (Del.Ch.1957) (Seitz, C.) (recognizing common law authority of stockholders to remove a director for cause). "Prior to 1967, the [DGCL] was silent as to the right to removal of directors." Welch, *supra*, § 141.5.4 at GCL–IV–205. As part of the significant revision of the DGCL in that year, Section 141(b) was amended to provide that each director would hold office "until his successor is elected or qualified 'or until his earlier resignation or removal.'" *Id.* at GCL–IV–206. In 1974, Section 141(k) was added to clarify the mechanics for removal. "Section 141(k) now provides, with certain exceptions, that any director or the entire board of directors may be removed, with or without cause, by the holders of a majority of the shares entitled to vote at an election of directors." *Id.* All of the Delaware cases which observe that a director has no vested right to continuing board service involve removal.[3] The specific references to removal in Sections 141(b) and (k), the absence of any

comparable provision addressing board shrinkage, and the background common law expectation that a director otherwise would serve out a full term absent cause *for removal* reinforce my view that eliminating directorships through board shrinkage is not permitted.

In reaching this conclusion, I recognize that Section 141(b)'s list of means by which a director's tenure may end does not mention death. *Compare* 8 *Del. C.* § 223(a)(1) (noting that vacancies may arise "by reason of death or resignation or other cause"). Barring a major breakthrough in séance technology, death remains an insurmountable barrier to board service. But death is a not procedural means by which a director's term can be brought to a close under a corporation's constitutive documents and the DGCL. To impose death on a director is not a legitimate method of effecting board change. It is a felony. To be a living, natural person is simply the irreducible minimum qualification for board service. Balotti & Finkelstein, *supra*, § 4.3 ("There are no statutory criteria or qualifications for directors, other than the requirement that they be natural persons."). I therefore do not regard the absence of any reference to death in Section 141(b) as implying that the identified means are non-exclusive.

For similar reasons, my reading of Section 141(b) is not affected by the possibility that a corporation might establish qualifications for directorship and provide that a director who ceased to meet them could no longer serve. *See* 8 *Del. C.* § 141(b) ("The certificate of incorporation or bylaws may prescribe other qualifications for di-

---

**3.** *See, e.g., Chesapeake Corp. v. Shore*, 771 A.2d 293, 345–47 (Del.Ch.2000) (rejecting vested rights argument in context of removal of directors after bylaw amendment to eliminate staggered board); *Roven v. Cotter*, 547 A.2d at 609 (holding that removal without cause was proper because directors "have no vested

right to hold office in defiance of a properly expressed will of the majority"); *Everett v. Transnation Dev. Corp.*, 267 A.2d 627, 630 (Del.Ch.1970) ("I am of the opinion that plaintiff, having no vested right in her office, has been properly removed as a director. . . .").

rectors."). This Court has upheld a limited example of such a provision that appeared in the certificate of incorporation. *Stroud v. Milliken Enters.*, 585 A.2d 1306, 1308 (Del.Ch.1988), *appeal dismissed*, 552 A.2d 476 (Del.1989). In light of the three procedural means for ending a director's term in Section 141(b), I do not believe a bylaw could impose a requirement that would disqualify a director and terminate his service. *Rohe v. Reliance Training Network, Inc.*, 2000 WL 1038190, at *12 (Del.Ch. July 21, 2000). Section 141(b)'s recognition of the bylaws as a locus for director qualifications instead contemplates reasonable qualifications to be applied at the front end, before a director's term commences, when the director is "elected and qualified." 8 *Del. C.* § 141(b); *see Triplex Shoe Co. v. Rice & Hutchins, Inc.*, 152 A. 342, 351 (Del.1930) (holding that bylaw requiring a director to be a stockholder mandated stock ownership prior to entering office). The concept of a bylaw that would end a director's service through disqualification thus lends no support to a bylaw that would accomplish the same thing through board shrinkage. Neither is valid under Section 141(b).

I further take into account that the DGCL permits the certificate of incorporation "to confer the power to adopt, amend or repeal bylaws upon the directors...." 8 *Del. C.* § 109(a). The charters of Delaware corporations routinely grant this authority to the board. Drexler, *supra*, § 9.02 at 9–2. If the By-law Amendments are valid, then they could be adopted by any board that had been granted that power. *CA, Inc. v. AFSCME Employees Pension Plan*, 953 A.2d 227, 231–32 (Del.2008).

If a bylaw amendment reducing the size of a board could eliminate sitting directors, then directors suddenly would have the power to remove other directors. For 89 years, Delaware law has barred directors from removing other directors. *Bruch v. Nat'l Guar. Credit. Corp.*, 116 A. 738, 741 (Del.Ch.1922); *accord* Robert Pennington, *Pennington on Delaware Corporations* 117 (1925) ("A director being an officer chosen by the stockholders cannot be removed by his fellow directors.").[4] In 1974, when the stockholders' power to remove directors was confirmed and addressed through the adoption of Section 141(k), two leading authorities on the DGCL wrote that "by negative implication intended by the draftsmen, directors do not have the authority to remove other directors." S. Samuel Arsht & Lewis S. Black, *The 1974 Amendments To The Delaware Corporation Law* 378 (1974). I do not believe the DGCL contemplates a bylaw amendment could overturn this rule.

■ Together, these authorities convince me that a bylaw that shrinks the size

---

4. For more recent Delaware decisions articulating this principle, see *Nevins v. Bryan*, 885 A.2d 233, 252 n. 70 (Del.Ch.2005) ("Delaware law does not permit directors to remove other directors."), *aff'd*, 884 A.2d 512 (Del.2005); *Solstice Capital II, Ltd. Partnership v. Ritz*, 2004 WL 765939, at *1 (Del.Ch. Apr. 6, 2004) (holding that "the attempt to remove ... a director by written consent of the board is invalid"); *Stroud*, 585 A.2d at 1309 ("Generally, directors do not have power under Delaware law to remove fellow directors."). *Accord Dillon v. Berg*, 326 F.Supp. 1214, 1225 (D.Del.) ("To allow the Board to remove one of its own members at any time without cause would seem to be completely violative of shareholder rights.... In the opinion of this Court such a provision would violate 8 *Del. C.* § 211 et seq. and the public policy of the State of Delaware and would thus be void and unenforceable."), *aff'd*, 453 F.2d 876 (3d Cir. 1971) (*per curiam*). *See generally* Balotti & Finkelstein, *supra*, § 4.4 at 4–14 ("While stockholders may remove directors for cause, it is highly doubtful whether directors, as opposed to stockholders, may be empowered by either the certificate of incorporation or by-laws to remove a director for cause.").

of the board below the number of sitting directors cannot eliminate the excess sitting directors. This leads to the alternative hypothesis: Might the excess directors continue on, bereft of their board seats, until their own terms ended through removal, resignation, or the election and qualification of a successor in accordance with Section 141(b)? Unseated directors might be analogized to holdover directors who have served beyond their allotted terms (whether because the corporation has not held a timely annual meeting or because no successor was validly elected and qualified) and yet remain validly in office. 8 *Del. C.* § 211(c); Drexler, *supra,* §§ 13.01[e] at 13–6 & 13.01[9] at 13–19.

Although the analogy to holdover directors has some first-blush appeal, it works against the defendants. The DGCL specifically authorizes holdover directors through Section 211(c). The DGCL says nothing about directors continuing in office in the absence of an underlying board seat. Our law does not contemplate a liminal state in which suddenly surplus directors might continue to exist, untethered from the statute or any constitutive corporate document.

Moreover, the lingering presence of directors *sans* board seats would create a direct conflict between the number of directors in office and the number of directors provided for in the bylaws. As noted above, Section 141(b) states that: "The number of directors shall be fixed by, or in the manner provided in, the bylaws, unless the certificate of incorporation fixes the number of directors. . . ." 8 *Del. C.* § 141(b). Section 141(b) does not contemplate a board with more directors serving

(albeit without official seats) than the "number . . . fixed by . . . the bylaws."

This does not mean that a charter or bylaw provision must establish a specific number of directors. A bylaw could provide for a number of directorships equal to the number of directors in office or set a range within which the board or stockholders might set the figure.[5] A floating number of directorships, however, is not what New Section 3.1 sought to accomplish. It set the number of EMAK directors to three. If the excess directors are not eliminated, then for a time EMAK will have a greater number of directors serving than what the Bylaws provide, which cannot occur under Section 141(b).

The existence of seatless directors continuing *qua* directors similarly conflicts with the statutory quorum requirement for board action. Section 141(b) provides:

A majority of the total number of directors shall constitute a quorum for the transaction of business unless the certificate of incorporation or the bylaws require a greater number. Unless the certificate of incorporation provides otherwise, the bylaws may provide that a number less than a majority shall constitute a quorum which in no case shall be less than 1/3 of the total number of directors except that when a board of 1 director is authorized under the provisions of this section, then 1 director shall constitute a quorum.

8 *Del. C.* § 141(b). "[T]he universal construction" of this language has been that it "refers to directorships, not directors actually in office." Drexler, *supra,* § 13.01[2],

5. See *Blish v. Thompson Automatic Arms Corp.,* 64 A.2d 581, 602 (Del.1948) (number of directors determined by stockholders at annual or special meeting); *Stroud,* 585 A.2d at 1308 (number of directors to be set by board but not less than 9 or more than 13); *Ellin v. Consol. Caribou Silver Mines,* 67 A.2d 416, 418–19 (Del.Ch.1949) (Seitz, V.C.) (number of directors set at three through stockholders' election of three directors at annual meeting); Drexler, *supra,* § 13.01[2] (describing methods for fixing number of directors).

at 13–5 n. 24; *see, e.g., Belle Isle Corp. v. MacBean,* 49 A.2d 5, 8 (Del.Ch.1946) (Seitz, V.C.) (basing quorum on directorships), *Mecleary v. John S. Mecleary, Inc.,* 119 A. 557, 559 (Del.Ch.1923) (same), *Bruch,* 116 A. at 740 (same).

Quorum requirements would be impossible to apply if the number of directors could exceed the number of directorships. Start with the statutory minimum quorum of "1/3 of the total number of directors" and envision a bylaw amendment that converted a board of twelve directors into a board of three directorships, with nine continuing but seatless directors. A single director could satisfy the statutory one-third quorum requirement, despite twelve directors serving on the board. EMAK has a majority quorum requirement. If the Bylaw Amendments turned two of the directors into continuing but seatless directors, then a quorum would be two out of three seats. Yet there would be five directors in office. The concept of continuing but seatless directors thus conflicts with Section 141(b)'s mechanism for determining a quorum. Once again, the Bylaw Amendments are void.

This brings me to a final and practical problem with the Bylaw Amendments: how to determine which directors are out of luck. Crown cleverly proposed to reduce the number of directors to three, two of whom are elected by Series AA Preferred. Crown then proposes that EMAK hold a special meeting at which a single director would be elected by the holders of the common stock.

For directors not elected by the holders of a particular class or series of stock, the DGCL establishes a logical and straightforward electoral cycle. Each year the corporation holds an annual meeting at which directors are elected. 8 *Del. C.* § 211(b). Except in the case of a properly classified board, all of the directorships contemplated by the corporation's charter and bylaws are up for election. 8 *Del. C.* §§ 141(d) & 211(c); *Rohe,* 2000 WL 1038190, at *11. Under this framework, "absent a specific charter or bylaw provision classifying a board, the term of office of each director is coextensive with the period between annual meetings." Drexler, *supra,* § 13.01[3] at 13–6.

At the annual meeting, the seats are filled by the nominees who (i) receive the largest number of votes and (ii) garner sufficient votes to satisfy the operative standard for election, if the corporation does not use plurality voting. 8 *Del. C.* § 216; *see* Drexler, *supra,* § 13.01[9] at 13–19 (explaining that under a majority voting system, "a director who is not elected by the required majority vote would remain in office, or 'hold over,' until a successor is elected and qualified"). The elected individuals then must qualify as directors, 8 *Del. C.* § 141(b), and must accept their directorship, *Blish,* 64 A.2d at 599. If no one was elected at the annual meeting to a particular directorship, or if the person elected did not accept the position or failed to qualify, then the individual serving in that seat prior to the annual meeting continues as a holdover director. 8 *Del. C.* § 211(c). At the next annual meeting, the process repeats itself.

In between annual meetings, a director may resign or be removed by the stockholders. 8 *Del. C.* §§ 141(b) & 141(k). Stockholders may effect removal either at a special meeting, 8 *Del. C.* § 211(a) & (d), or by expressing written consent in lieu of action taken at a meeting of stockholders, unless action by consent is prohibited under the charter, 8 *Del. C.* § 228(a). Section 211(b) reinforces the distinction between an annual meeting and intervening stockholder action. It provides that stockholders can take action by written consent to elect directors in lieu of

an annual meeting if (i) the action by consent is unanimous *or* (ii) "all of the directorships to which directors could be elected at an annual meeting held at the effective time of such action are vacant and are filled by such action." 8 *Del. C.* § 211(b). To operate in lieu of an annual meeting, a non-unanimous written consent thus must first *remove* any sitting directors and then fill the resulting vacancies. Stockholders cannot simply use a non-unanimous written consent to elect successor directors between annual meetings. Section 211 does not and need not impose any similar qualifications on action taken at a special meeting, because Section 211 distinguishes between annual and special meetings and provides that "an annual meeting of stockholders shall be held for the election of directors. . . ." *Id.*

New Section 3.1.1 conflicts with this framework by conflating what takes place at an annual meeting with what can take place in between annual meetings. New Section 3.1.1 provides that if the number of directors in office is greater than three, then a special meeting of stockholders will be called at which "one director" will be elected by the common stockholders "who shall be the successor to all directors previously elected by the common stockholders of the Corporation." If the number of seats on the board was reduced in conjunction with the election of directors at an annual meeting such that only one seat was up for election, then this mechanism would be valid. In that scenario, stockholders would elect directors to all available seats, albeit only one, and the terms of the previously serving directors would expire in conjunction with the election and qualification of their singular successor.

New Section 3.1.1 does not propose to alter the Board's size in conjunction with an annual meeting. It contemplates the calling of a *special meeting* at which stock-

holders would act to elect a "successor" director. The election of successors takes place at an *annual meeting*, not in between annual meetings. Stockholders can act in between annual meetings to remove directors, to fill vacancies, or to fill newly created directorships. Drexler, *supra*, § 13.02 at 13–27 to 13–28. They cannot end a director's term prematurely by purporting to elect the director's successor early. Permitting such action would contradict the limited and enumerated means in which a director's term can end under Section 141(b), the specific mechanism for director removal set forth in Section 141(k), and the concept of an *annual meeting* at which directors are elected under Section 211(b).

I therefore hold that both the Bylaw Amendments are invalid. Although it is undisputed that Crown delivered written consents sufficient to amend the Bylaws, the amendments Crown attempted to adopt were ineffective.

## B. The TBE Consents Are Valid And Effective.

I now turn to the TBE Consents. The defendants say the TBE Consents cannot be effective because of the absence of a DTC omnibus proxy. They also argue that Kurz obtained the pivotal votes through illegal vote buying, that the Purchase Agreement violated the transfer restrictions governing Boutros's shares, and that the whole transaction was tainted by insider trading. Lastly, they contend that the TBE Consents were solicited through false and misleading disclosures. I reject these challenges and hold that the TBE Consents validly effected corporate action.

### 1. The Broadridge Omnibus Consents Validly Voted The Street Name Shares Held At DTC.

I first consider whether the Broadridge omnibus consents validly voted the street-

name shares without an omnibus proxy from DTC. I will confess that when I first learned about the absence of a DTC omnibus proxy, I thought it was a clean winner for the defendants. But the DTC omnibus proxy has proven to be an enigma. There is no legal authority addressing how one is obtained, by whom, or when it will be issued. DTC itself does not appear to have any written policies or procedures governing the matter. The actual document contributes nothing to the voting process. All of the substantive information contained in the DTC omnibus proxy appears on a Cede breakdown. The omnibus proxy simply reformats the information and appends a computer generated page reciting a boilerplate grant of proxy authority. Even this does not represent actual action by DTC. Because DTC lacks discretionary voting authority over the shares it holds, DTC inevitably passes on its voting authority, however mysterious the process by which this occurs. As then Vice Chancellor, now Justice Berger noted, "the Omnibus Proxy is but a formality." *Olson v. Buffington,* 1985 WL 11575, at *3 (Del.Ch. July 17, 1985). But it is a formality that can carry serious consequences. Here its absence is said to disenfranchise the holders of a majority of EMAK's common stock and prevent them from electing new directors. In another case its absence might allegedly prevent the existence of a quorum or invalidate the vote on a corporate transaction.

As I will describe below, the DTC omnibus proxy appears to have evolved spontaneously in the 1970s after Congress and the SEC implemented a policy of share immobilization through the depository system. This federal mandate forced banks and brokers who formerly appeared as registered holders on the stock ledgers of Delaware corporations to place their shares with four regional depositories. A mind whose identity is lost to the mists of time must have recognized that the depositories now appeared on the stock ledgers, and thus some mechanism would be needed for purposes of Delaware law to ensure that the depositories' voting authority was transferred to the banks and brokers. *For purposes of federal law, the banks and brokers continued to be viewed as the record holders of the shares held by the depositories.*

The need for a Delaware law mechanism stemmed from our state's well-founded policy, developed decades before share immobilization, of limiting stockholder rights to record holders. In all but the rarest of instances, Delaware courts refuse to inquire into the relationship between the beneficial holder and record holder, which we regard as a matter for those parties and not a concern of the corporation. The advent of the depository system did not require Delaware to revisit this aspect of our jurisprudence. Virtually all of the cases that implicated the rule started at the top of the ownership chain with the beneficial holder. Thus when a beneficial holder sought books and records (prior to the 2003 amendments to Section 220) or appraisal (prior to the 2007 amendments to Section 262), it was easy to rule that the beneficial owner lacked stockholder status. It did not matter that the record holder at the bottom of the chain was now DTC rather than a bank or broker. The outcome was the same.

On the one legal issue that required our courts to start from the bottom of the ownership chain and examine the link between DTC and its participant members, our decisions reached a different result. Thus over three decades ago, when stockholders first sought stocklists after the creation of the depositary system, the Court of Chancery did not hold that the depository was the stockholder of record and the stock ledger stopped there. Our

courts instead held that the Cede breakdown *was* part of the stock ledger for purposes of Section 220.

Like the stocklist cases, this case requires me to start from the bottom of the ownership chain and examine the link between DTC and its participant banks and brokers. I hew to prior precedent holding that only a stockholder of record can execute a written consent. I further hold, following then Vice Chancellor, now Justice Berger's prescient *dictum* in *Olson,* that the Broadridge omnibus consents are valid because it is clear they voted positions held at DTC. I finally conclude that the Cede breakdown is part of the stock ledger for purposes of Section 219(c), just as the Cede breakdown has long been part of the stock ledger for purposes of Section 220(b). I believe it will help rather than harm our law to treat the DTC participant banks and brokers who appear on the Cede breakdown as stockholders of record. Because this represents a change in how Delaware practitioners understand the stock ledger for purposes of voting, it is not a conclusion I reach lightly. Sir John Maynard Keynes famously observed, "When the facts change, I change my mind. What do you do, sir?" This case had forced me to evaluate critically the facts surrounding the DTC omnibus proxy and the relationship between DTC and its participant members. I find they are quite different from what our case law historically has assumed.

### a. A Written Consent Must Be Executed By A Record Holder.

The plaintiffs' first response to the lack of a DTC omnibus proxy is to argue that a written consent need not be executed by a stockholder of record. In two decisions, this Court previously held that only a stockholder of record can execute a written consent. *Freeman v. Fabiniak,* 1985 WL 11583 (Del.Ch. Aug.15, 1985); *Gryn-*

*berg v. Burke,* 1981 WL 17034 (Del.Ch. Aug.31, 1981). The plaintiffs ask me to disregard these opinions, which the plaintiffs contend betray an unfounded hostility towards the then-novel use of written consents in control contests and an unjustified preference for the traditional stockholder meeting. *See Freeman,* 1985 WL 11583, at *5 (describing Section 228 as "an undesirable vehicle to resolve the dispute between two factions"); *Grynberg,* 1981 WL 17034, at *6 (describing Section 228 as "obviously designed to facilitate shareholder action where the outcome is a foregone conclusion" and suggesting that the difficulties presented by the case "could have been avoided at a noticed meeting").

■ Both as a matter of statutory analysis and for policy reasons, I agree with *Freeman* and *Grynberg.* Section 228(a) provides:

Unless otherwise provided in the certificate of incorporation, any action required by this chapter to be taken at any annual or special meeting of stockholders of a corporation, or any action which may be taken at any annual or special meeting of such stockholders, may be taken without a meeting, without prior notice and without a vote, if a consent or consents in writing, setting forth the action so taken, shall be signed *by the holders of outstanding stock having not less than the minimum number of votes that would be necessary to authorize or take such action at a meeting at which all shares entitled to vote thereon were present and voted* and shall be delivered to the corporation by delivery to its registered office in this State, its principal place of business or an officer or agent of the corporation having custody of the book in which proceedings of meetings of stockholders are recorded. . . .

8 *Del. C.* § 228(a) (emphasis added). Section 228(c) requires that each consent "bear the date of signature of each stockholder" and that to be effective, consents "signed by a sufficient number of holders" must be delivered to the corporation "within sixty days of the earliest dated consent." 8 *Del. C.* § 228(c).

Admittedly these sections use the terms "holders of outstanding stock," "holder," and "stockholder," rather than "stockholder of record." The DGCL thus does not explicitly distinguish between stockholders of record and beneficial holders with respect to the authority to execute a written consent. The full phrase in Section 228(a), however, refers to action taken "by the holders of outstanding stock having not less than the minimum number of votes that would be necessary to authorize or take such action at a meeting at which all shares entitled to vote thereon were present and voted." The concept of "holders of outstanding stock" is thus framed in terms of authorizing or taking action "at a meeting."

Section 219(c) of the DGCL provides that "[t]he stock ledger shall be the only evidence as to who are the stockholders entitled by this section ... to vote in person or by proxy at any meeting of stockholders." 8 *Del. C.* § 219(c). "The ledger is a compilation of the transfers by and to each individual shareholder, with each transaction separately posted to separately maintained shareholder accounts." 2 Drexler, *supra,* § 25.03 at 25–7. The ledger thus differs from a stocklist, which is "a compilation of the currently effective entries in the stock ledger." *Id.* Under Section 219(a), "at least 10 days before every meeting of stockholders," the officer in charge of the stock ledger must "prepare and make ... a complete list of the stockholders entitled to vote at the meeting." 8 *Del. C.* § 219(a).

Over half a century ago, the Delaware Supreme Court held that only registered stockholders may exercise the power to vote in a Delaware corporation. *Am. Hardware Corp. v. Savage Arms Corp.,* 136 A.2d 690, 692 (Del.1957); *accord In re Giant Portland Cement Co.,* 21 A.2d 697, 701 (Del.Ch.1941) ("The right to vote shares of corporate stock, having voting powers, has always been incident to legal ownership."); *Atterbury v. Consolidated Coppermines Corp.,* 20 A.2d 743, 749 (Del. Ch.1941) ("[T]he corporation will recognize the registered owner as the true owner ...."). In the *American Hardware* case, Savage Arms sought stockholder approval of a stock-for-stock acquisition and sent out the notice of meeting and proxy statement sixteen days before the meeting date. American Hardware objected, arguing that "because one-third of the outstanding shares were held in brokers' accounts, the time allowed for all the stockholders to receive and consider the opposition's proxy material was insufficient." *Am. Hardware,* 136 A.2d. at 692. The Delaware Supreme Court rejected this argument, observing that "[t]he answer to this point is simple." *Id.*

> Under the General Corporation Law, no one but a registered stockholder is, as a matter of right, entitled to vote, with certain exceptions not pertinent here. If an owner of stock chooses to register his shares in the name of a nominee, he takes the risks attendant upon such an arrangement, including the risk that he may not receive notice of corporate proceedings, or be able to obtain a proxy from his nominee. The corporation, except in special cases, is entitled to recognize the exclusive right of the registered owner to vote.... The corporation has ordinarily discharged its obligation under Delaware law when it mails notice to the record owner.

*Id.* at 692 (footnote and internal citations omitted). Subsequent decisions have consistently limited the right to vote to record holders.[6]

By framing the taking of action by written consent in terms of the holders of outstanding stock who would have sufficient votes to take similar action at a meeting where all shares entitled to vote were present, Section 228(a) incorporates the concept of record ownership that governs voting at a meeting of stockholders. Section 228 is thus appropriately interpreted as requiring that a written consent be executed by a stockholder of record. *Freeman*, 1985 WL 11583, at *5; *Grynberg*, 1981 WL 17034, at *6.

Section 228(e) reinforces this interpretation. It requires that prompt notice of corporate action taken by less than unanimous written consent be provided to nonconsenting stockholders "who, if the action had been taken at a meeting, would have been entitled to notice of the meeting if the record date for notice of such meeting had been the date that written consents signed by a sufficient number of holders . . . were delivered to the corporation. . . ." 8 *Del. C.* § 228(e). By defining the notice obligation for written consents in terms of what would be required for a hypothetical meeting, Section 228(e) strengthens the connection between voting by consent and voting at a meeting. I also rely on Section 212(b), which provides that "[e]ach stockholder entitled to vote at a meeting of stockholders or to express consent or dissent to corporate action in writing without a meeting may authorize another person or persons to act for such stockholder by proxy. . . ." 8 *Del. C.* § 212(b). By treating stockholders identically for purposes of granting proxy authority, regardless of whether the vote is at a meeting or by written consent, Section 212(b) indicates that the same principles should apply in both instances. Just as only a stockholder of record can vote at a meeting, only a stockholder of record can execute a written consent.

■ As a matter of Delaware public policy, there is much to be said for requiring a written consent to be executed by a record holder, which allows the corporation or an inspector of elections to determine from readily available records whether the consent was valid. Certainty and efficiency are critical values when determining how stockholder voting rights have been exercised. *Williams v. Sterling Oil of Oklahoma, Inc.*, 273 A.2d 264, 265–66 (Del.1971); *North Fork Bancorp., Inc. v. Toal*, 825 A.2d 860, 868 n. 19 (Del.Ch. 2000); *Blasius Indus., Inc. v. Atlas Corp.*, 564 A.2d 651, 668 (Del.Ch.1988) (Allen, C.). This is particularly true for consents, which are effective upon delivery to the corporation of a sufficient number of valid consents. 8 *Del. C.* § 228(a).

For all of these reasons, I continue to follow *Freeman* and *Grynberg* and hold

---

**6.** *See, e.g., Shaw v. Agri–Mark, Inc.*, 663 A.2d 464, 469–70 (Del.1995) (recognizing "long-established rule that a corporation may rely on its stock ledger in determining which stockholders are eligible to vote"); *Berlin v. Emerald Partners*, 552 A.2d 482, 494 (Del. 1988) ("Delaware law expressly recognizes the right of the corporation to rely upon record ownership, not beneficial ownership, in determining who is entitled to notice of and to vote at the meetings of stockholders."); *Preston v. Allison*, 650 A.2d 646, 649 (Del. 1994) ("[T]he corporation generally is entitled to rely on its own stock list and recognize votes . . . only when initiated by the stockholder of record."); *Testa v. Jarvis*, 1994 WL 30517, at *6 (Del.Ch. Jan.12, 1994) ("Delaware corporations may rely almost exclusively on the stock ledger to determine the record holders eligible to vote in an election. . . . Where the company's ledgers show record ownership, no other evidence of shareholder status is necessary.") (Allen, C.).

that a written consent must be executed by a record holder.

### b. Under *Olson,* The Broadridge Omnibus Consents Validly Voted The Shares Held By The Banks And Brokers At DTC.

■ That a written consent must be executed by a stockholder of record does not end the analysis. The DGCL recognizes the power of a proxy holder to execute a written consent on behalf of a record holder. 8 *Del. C.* § 212(b). While authorizing particular forms of proxy authority, Section 212 by its terms declines to limit "the manner in which a stockholder may authorize another person or persons to act for such stockholder as proxy." 8 *Del. C.* § 212(c). A proxy is only *evidence* of an agent's authority to vote shares owned by another. *Eliason v. Englehart,* 733 A.2d 944, 946 (Del.1999). "The paper writing which we call a proxy is nothing more than evidence of a relationship. It is not the relationship. It simply testifies that A. has constituted B. his agent to act for him in a vicarious capacity." *Duffy v. Loft, Inc.,* 151 A. 223, 227 (Del.Ch.1930), *aff'd.,* 152 A. 849 (Del. 1930).

■ In *Olson,* Justice Berger anticipated the scenario I face. In adjudicating a Section 225 action, Justice Berger considered whether eight written consents executed by individual brokerage houses, such as Bear Stearns & Co. and Prudential–Bache Securities, Inc., and others not identified in her post-trial opinion, could validly express consents for the shares they held at Cede without an omnibus proxy from DTC. Of the eight consents, five identified Cede as the record holder, but three did not. In commenting on this omission, she noted that "[a] so-called Cede 'breakdown' is readily available which, for any given company, lists the participating firms and number of shares held." 1985 WL 11575, at *2.

In *Olson,* as here, the defendants argued that the votes could not be counted without the DTC omnibus proxy. The plaintiffs argued that the broker ownership was apparent from the Cede breakdown and that the consents were valid. Justice Berger observed that "Defendants do not dispute that Cede breakdowns are readily available or that the Omnibus Proxy is but a formality." *Id.* at *3. She then remarked:

> Plaintiffs' argument would be more compelling if either all of the consents identified Cede as the record holder or Cede was the only depository company listed as a record holder on Olson Farms' books. However, neither of those facts are present in this case. As a result, Olson Farms would have had to obtain breakdowns from each of the four depository companies listed as record stockholders in order to determine the validity of the brokerage house consents. Although this task is far from onerous given the limited number of depository companies involved here, another company could have scores of depository companies on its stocklist thereby significantly increasing the burden.

*Id.* at *3.

Justice Berger then held that the brokerage house consents that did not identify Cede were invalid. Because this holding rendered the number of consents insufficient to effect corporate action, she did not reach the validity of the other consents. She nevertheless cautioned:

> There well may be an exception to the *Grynberg* requirement that consents be executed by stockholders of record in cases where the consent is executed by a brokerage house and the record holder is a depository company. However, if such an exception were recognized, it would be essential that the depository

company be identified on the consent in order to provide the company a ready means of verifying the brokerage houses' holdings.

*Id.*

Commentators took note of *Olson.* As described in one Delaware treatise, "[a] more recent authority applying the election review procedures of Section 225 to a consent action suggests that a beneficial owner may execute a valid consent without the formality of a proxy from the record holder, so long as the consent identifies the record holder and the authority of the beneficial holder to control voting of the shares is clear." 2 Drexler, *supra,* § 31.03[2] at 31-9. After discussing *Olson,* another commentator notes: "Consents from ... brokers that fail to identify or incorrectly identify the record holder are generally invalidated by independent inspectors. The proxy solicitor for the dissident is responsible for reviewing consents to have such errors corrected by the brokers in advance." Eric S. Robinson, *Defensive Tactics In Consent Solicitations,* 51 Bus. Law. 677, 696–97 (1996).

This case fits within the scenario anticipated by Justice Berger in *Olson.* Although historically there were other regional depositories,[7] the evidence at trial established and the literature confirms that DTC is now the only depository.[8] As Dennedy testified and the documentary evidence confirms, Cede is the only nominee on EMAK's stocklist. Dennedy recognized that every bank or broker on the Broadridge omnibus consents can be traced to a listing on either the Cede breakdown or the record list. Each bank or broker that appears on the Broadridge omnibus consents has a DTC account number next to its name. There is no ambiguity about where the shares are held. It would have been a simple matter for EMAK or IVS to determine the validity of the bank and broker consents, just as plaintiffs' counsel established their validity at trial through Dennedy.

I view *Olson* as recognizing the reality that DTC inevitably transfers voting authority to its participant member banks and brokers, making it unnecessary to provide specific evidence of proxy authority at the time the broker consent is delivered. This is already the practice for the powers of attorney by which the banks and brokers transfer their voting authority to Broadridge. Each page of the Broadridge omnibus consents bears the following legend: "This proxy is issued pursuant to powers of attorney executed by each listed brokerage firm or nominee which are in full force and effect as of the date hereof. The powers of attorney are on file with the offices of Broadridge Financial Information Services, Inc." No one has argued that the Broadridge omnibus consents are invalid because Broadridge did not deliver copies of its powers of attorney. The par-

---

7. There were three regional depositories in addition to DTC: the Midwest Securities Depository Trust Company held through its nominee, Kray & Co.; the Pacific Securities Depository Trust Company held through its nominee, Pacific & Co.; and the Philadelphia Depository Trust Company held through its nominee, Philadep & Co. I have not found anything to suggest that there were ever more than the four depositories, although I cannot rule out the possibility.

8. R. Franklin Balotti, *et al., Meetings of Stockholders* § 10.6 at 10–11 (2009 Supp.) (hereinafter, *"Meetings of Stockholders"*) ("At the present time, there is one major depositary, CEDE & CO., nominee for large stock exchanges and many banks."); Teresa Carnell & James J. Hanks, Jr., *Shareholder Voting and Proxy Solicitation: The Fundamentals,* Maryland Bar Journal 23, 26 (Jan./Feb. 2004) ("While major, regional exchanges had previously maintained their own depositories, in the 1990's DTC ... assumed the activities of the depositories for the regional exchanges.").

ties and the proxy solicitation industry all accept that Broadridge has the necessary authority. The parties and the proxy solicitation industry similarly understand that DTC transfers its voting authority to its participant member banks and brokers.

I therefore hold that under *Olson,* the Broadridge omnibus consents validly voted the street name shares.

### c. The Banks And Brokers On The Cede Breakdown Are Stockholders Of Record Under Section 219(c).

■ Recognizing that the language I apply from *Olson* is technically *dictum,* and further recognizing that it represents an exception to the rule set out in Section 219(c) that only stockholders of record who appear on the stock ledger can vote, I take the next step of considering whether the Cede breakdown should be part of the stock ledger for purposes of Section 219(c). There is a straightforward basis for doing so, namely our law's long recognition that the Cede breakdown is part of the stock ledger for purposes Section 220(b). If the Cede breakdown is part of the stock ledger, then the banks and brokers who appear on the Cede breakdown have the power to vote as record holders at a meeting of stockholders or for purposes of taking action by written consent.

In the Factual Background, *supra,* I briefly summarized the depository arrangement by which shares held in street name are owned of record by DTC. Numerous Delaware decisions have referred to this system.[9] Scholars have explored its mixed implications, which are generally beneficial for securities trading, capital raising, and the vibrancy of public markets, but frequently problematic for stockholder voting.[10] One leading treatise describes the system as "[t]he single greatest source of confusion in the proxy process" and "largely responsible for the mistakes and confusion that arise during proxy solicitations." *Street Name* at 10–3. Another leading treatise notes that "[w]hile the depositary system operates successfully in most ways, much was left to be desired in the voting of proxies." *Meetings of Stockholders* at 10–11.

The history of how we ended up with the depository system is recounted consistently across a variety of sources, including on DTC's website.[11]

---

9. *E.g., Enstar Corp. v. Senouf,* 535 A.2d 1351, 1353 n. 2 (Del.1987); *In re Appraisal of Transkaryotic Therapies, Inc.,* 2007 WL 1378345, at *2 (Del.Ch. May 2, 2007); *Seidman & Assocs., L.L.C. v. G.A. Fin., Inc.,* 837 A.2d 21, 24 (Del.Ch.2003); *Nelson v. Frank E. Best Inc.,* 768 A.2d 473, 476 (Del.Ch.2000); *Gotham Partners, L.P. v. Hallwood Realty Partners, L.P.,* 2000 WL 1597909, at *4 (Del.Ch. Oct. 20, 2000); *Edgerly v. Hechinger Co.,* 1998 WL 671241, at *1 (Del.Ch. Aug. 27, 1998); *Weinstein v. Dolco Packaging Corp.,* 1997 WL 118399, at *1 (Del.Ch. Mar.11, 1997); *Scherer v. R.P. Scherer Corp.,* 1988 WL 103311, at *2 (Del.Ch. Oct. 5, 1988); *Blasius,* 564 A.2d at 664; *LeCompte v. Oakbrook Consol., Inc.,* 1986 WL 2827, at *1 (Del.Ch. Mar. 7, 1986); *Lerman v. Diagnostic Data, Inc.,* 1980 WL 6411, at *2 (Del.Ch. Aug. 12, 1980); *JAS Sec., LLP v. Am. Intern. Group, Inc.,* 1999 WL 1441991, at *2 (Del.Super.Dec. 13, 1999).

10. Professors Kahan and Rock have authored a particularly thorough and helpful article exploring the DTC system and its ramifications for voting. Marcel Kahan & Edward Rock, *The Hanging Chads of Corporate Voting,* 96 Geo. L.J. 1227 (2008) (hereinafter *"Hanging Chads"*).

11. *E.g.,* Securities and Exchange Commission, *Study Of Unsafe And Unsound Practices Of Brokers And Dealers,* H.R. Doc. No. 92–231, 92d Cong., 2d Sess. 9–10 (1971) (hereinafter *"SEC Study"*); Uniform Commercial Code, Prefatory Note to Article 8 (revised 1994) (hereinafter *"Prefatory Note"*); *Street Name* at 10–6 n. 5; *Hanging Chads* at 1237–38 & nn. 45–50, 1273–74; Carnell & Hanks, *supra,* at 26; Emily I. Osiecki, *Alabama By-Products Corp. v. Cede & Co.: Shareholder Protection Through Strict Statutory Construction,* 22 Del. J. Corp. L. 221, 223–28 (1997);

Prior to 1970, negotiation was the most common method used to transfer stock in the United States. The owner would endorse the physical certificate to the name of the assignee on the back of the certificate. This endorsement instruct[ed] the corporation, upon notification, to the change in ownership of the shares on its corporate books. If the parties used the services of a broker, the seller would transfer the certificate to his brokerage firm. The brokerage firm representing the customer buying the security would receive the physical certificate and transfer it to the buyer as the new record owner of the security. Occasionally, the new owner might request that the physical certificate remain at the street address of the brokerage firm to facilitate the transfer of the certificate in a subsequent sale.

*Escheat* at 180 (footnotes omitted).

Transfer of securities in the traditional certificate-based system was a complicated, labor-intensive process. Each time securities were traded, the physical certificates had to be delivered from the seller to the buyer, and in the case of registered securities the certificates had to be surrendered to the issuer or its transfer agent for registration of transfer.

*Prefatory Note* at 2.

By the late 1960s, a tremendous increase in trading rendered the certificate system obsolete. The paperwork burden reached "crisis proportions." *Prefatory Note* at 2. Stock certificates and related documents were piled "halfway to the ceiling" in some offices; clerical personnel were working overtime, six and seven days a week, with some firms using a second or even a third shift to process each day's

transaction. Hours of trading on the exchange and over the counter were curtailed to give back offices additional time after the closing bell. Deliveries to customers and similar activities dropped seriously behind, and the number of errors in brokers' records, as well as the time to trace and correct these errors, exacerbated the crisis.

*SEC Study* at 219 n. 1 (quoted in *Escheat* at 181 n. 49). "The difficulty that brokers and dealers experienced in keeping their records due to the volume of transactions and their thin capitalization caused many brokerage firms to declare bankruptcy and many investors to realize losses." *Escheat* at 182.

Congress responded by passing the Securities Investor Protection Act of 1970, which required the SEC to study the practices leading to the growing crisis in securities transfer. 15 U.S.C. § 78kkk(g) (2006). The SEC recommended discontinuing the physical movement of certificates and adopting a depository system. *Escheat* at 182 n. 58 (*citing SEC Study* at 13). Congress then passed the Securities Acts Amendments of 1975 which, among other things, directed the SEC to "use its authority under this chapter to end the physical movement of securities certificates in connection with the settlement among brokers and dealers of transactions in securities consummated by means of the mails or any means or instrumentalities of interstate commerce." 15 U.S.C. § 78q–1(e) (2006). In a resulting report, the SEC found that "the practice of registering securities in other than the name of the beneficial owner" was essential to establishing "a national system for the prompt and accurate clearance and settle-

Suellen M. Wolfe, *Escheat and the Challenge of Apportionment: A Bright Line Test To Slice A Shadow*, 27 Ariz. St. L.J. 173, 178–88 (1995) (hereinafter *"Escheat"*); About DTC–History, http://www.dtcc.com/about/history/ (last visited January 31, 2010).

ment of securities transactions." Securities and Exchange Commission, *Final Report on the Practice of Recording The Ownership Of Securities In The Records Of The Issuer In Other Than The Name Of The Beneficial Owner Of Such Securities* 10 (1976), *quoted in Hanging Chads* at 1237 n. 49.

Thus was born the federal policy of immobilizing share certifications through a depository system. *Hanging Chads* at 1237. To comply, "[b]rokerages and banks created [depositories] to allow them to deposit certificates centrally (so-called 'jumbo certificates,' often representing tens or hundreds of thousands of shares) and leave them at rest." Larry T. Garvin, *The Changed (And Changing?) Uniform Commercial Code*, 26 Fla. St. U.L.Rev. 285, 315 (1999). Under the regulations implementing the federal policy, it was and remains the banks and brokers, not the depositories, who are record holders of the securities for purposes of federal law. Depositories are defined as "clearing agencies." 15 U.S.C. § 78c(a)(23)(A). The term "record holder" is defined as "any broker, dealer, voting trustee, bank, association or other entity that exercises fiduciary powers which holds securities of record in nominee name or otherwise as a participant in a clearing agency registered pursuant to Section 17A of the Act." 17 C.F.R. § 240.14a–1(i) (2009). The term "entity that exercises fiduciary powers" is similarly defined as "any entity that holds securities in nominee name or otherwise on behalf of a beneficial owner but does not include a clearing agency registered pursuant to Section 17A of the Act or a broker dealer." 17 C.F.R. § 240.14a–1(c). One implication of the federal approach is that to determine whether an issuer has 500 or more record holders of a class of its equity securities such that it must register under 15 U.S.C. § 78*l*(g), DTC does not count as a single holder of record. Each

DTC participant member counts as a holder of record. Michael K. Molitor, *Will More Sunlight Fade The Pink Sheets?*, 39 Ind. L.Rev. 309, 315–16 (2006) (citing SEC interpretive releases).

In 1973, in the aftermath of the paperwork crisis and with the federal writing on the wall, the members of the New York Stock Exchange created DTC to serve as a clearing agency. Today DTC is the world's largest securities depository and the only domestic depository. DTC has been estimated to hold "about three-quarters of [the] shares in publicly traded companies." Garvin, *supra*, at 315; *accord Hanging Chads* at 1236; *Street Name* at 10–4 n. 2.

Approximately 600 banks and brokers are participant members of DTC. Russell A. Hakes, *UCC Article 8: Will The Indirect Holding of Securities Survive The Light of Day?*, 35 Loy. L.A. L.Rev. 661, 685 (2002); *Prefatory Note* at 2. Warehousing securities with DTC allows shares to trade through an electronic book entry system. *Street Name* at 10–7.

> When a customer of one of DTC's participants buys or sells shares, appropriate changes are made on the books of the participants. At the end of each day, the transactions are netted out, so that only the net changes for each participant need be recorded by DTC. Each broker makes similar book entries. Thus, if one customer of a broker buys one hundred shares of a certain stock, and another sells one hundred shares, the brokerage need not report anything.... The clearing agent and DTC's books will show no change.

Garvin, *supra*, at 315–16; *accord Street Name* at 10–7; *Prefatory Note* at 2–3. Dennedy described this process during his trial testimony.

The holding of securities through DTC has potential consequences under Delaware law because it is Cede, not the DTC-participant banks and brokers, who appears on the stock ledger of a Delaware corporation. Indeed, as Dennedy explained, Cede is typically the largest record holder on the stock ledger of most publicly traded Delaware corporations. *Accord Street Name* at 10–6. As I discussed previously, Delaware law operates on the premise that only stockholders who appear on the stock ledger have authority to vote at a meeting or express consent.

The DTC omnibus proxy currently serves as the improvised coupling by which the federally mandated system of indirect ownership through DTC links up with Delaware's traditional system of direct ownership evidenced through the stock ledger. There does not appear to be any federal statute or regulation, any listing standard, or any state statute or decision calling for the issuance of the DTC omnibus proxy. At some point someone must have recognized that a mechanism was needed to ensure the transfer of DTC's voting authority to the participant members. One treatise explains the situation matter-of-factly as follows: "Because DTC has no beneficial interest in its shares . . ., it has devised a mechanism to pass on its voting rights. This mechanism, called the 'omnibus proxy,' provides for the transfer of DTC's voting right to its clients—the bank and broker participants." *Street Name* at 10–9. Another treatise states simply that "[b]ecause of the failure of the [depository] system to function in the issuance of proxies, the 'omnibus proxy' was instituted." *Meetings of Stockholders* at 10–12.

There does not appear to be any authority governing *when* a DTC omnibus proxy is issued, who should ask for it, or what event triggers it. The parties tell me that DTC has no written policies or procedures

on the matter. Commentators are vague. *See* Carnell & Hanks, *supra*, at 28 ("Because Cede does not vote, Cede delivers an 'omnibus proxy' to the issuer as soon as possible after the record date for the meeting."), J. Robert Brown, Jr., *The Shareholder Communication Rules and the Securities and Exchange Commission: An Exercise in Regulatory Utility or Futility?*, 13 J. Corp. L. 683, 753 (1988). ("As a practical matter . . . depositories execute omnibus proxies in favor of participants shortly after the issuer's record date."). By contrast, federal law requires DTC-participant bank custodians to issue an omnibus proxy "within five business days after the record date." 17 C.F.R. § 240.14b–2(b)(2).

It appears to me that DTC issues the omnibus proxy as a matter of course during the interactions between issuers and DTC that are compelled by the federal securities laws. When preparing for a meeting of stockholders or a consent solicitation, issuers are required by federal law to go through DTC to identify the participant banks and brokers for purposes of distributing voting cards and solicitation materials. At least twenty business days prior to the record date, an issuer must send a broker search card to any "broker, dealer, voting trustee, bank, association, or other entity that exercises fiduciary powers in nominee name" that the company "knows" is holding shares for beneficial owners. 17 C.F.R. § 240.14a–13(a). Rule 14a–13 provides that "[i]f the registrant's list of security holders indicates that some of its securities are registered in the name of a clearing agency registered pursuant to Section 17A of the Act (*e.g.*, 'Cede & Co.,' nominee for Depository Trust Company), the registrant shall make appropriate inquiry of the clearing agency and thereafter of the participants in such clearing agency." 17 C.F.R. § 240.14a–13(a) n. 1. As a practical matter, an issuer typically starts

the process by requesting a Cede breakdown so that it can send out the broker search cards. Carnell & Hanks, *supra,* at 27. The search cards ask for information about the number of proxies and other solicitation materials needed for forwarding to beneficial owners. 17 C.F.R. § 240.14a–13(a)(1)(i). Banks and brokers are required to respond with the requested information. 17 C.F.R. §§ 240.14b–1(b)(1) & 240.14b–2(b)(1). Once this process is complete, the issuer provides each bank and broker with sufficient copies of the proxy statement, card, and other materials for distribution to the beneficial owners. 17 C.F.R. § 240.14b–1.

Through this process, DTC learns early on of the record date for a meeting. The information goes into the DTC system, and at some point the DTC omnibus proxy pops out. When the system works—and to DTC's credit it usually does—the DTC omnibus proxy is simply another item for the meeting preparation checklist. But when the system breaks down, as it did in this case, insisting on the need for the DTC omnibus proxy disenfranchises stockholders. This is contrary to Delaware public policy, which rests on a "general policy against disenfranchisement." *Centaur Partners, IV v. National Intergroup, Inc.,* 582 A.2d 923, 927 (Del.1990) (quoting *Blasius,* 564 A.2d at 669).

In my view, our law benefits from treating the Cede breakdown as part of the stock ledger for purposes of Section 219(c). When viewed pragmatically, the federal policy of share immobilization caused publicly traded Delaware corporations to outsource one part of their stock ledger—the

Cede breakdown—to DTC, just as Delaware corporations by choice outsource the other parts of their stock ledger and related functions to transfer agents. Prior to share immobilization, banks and brokers appeared on the stock ledger as registered holders. After share immobilization, the same banks and brokers appear on the stock ledger indirectly through DTC and the Cede breakdown. As Dennedy explained, Delaware corporations already use transfer agents to "keep track of the registered shareholders, those shareholders that are not in street name." No one balks at this; it is an efficient outsourcing of a corporate function. But when a Delaware corporation already generates its stocklist by calling a transfer agent to get the record holder information, it hardly seems problematic for the same corporation to call DTC to get the Cede breakdown. This approach also aligns Delaware law with the federal regulations under which the participant banks and brokers, not DTC, are the record holders of the shares held by DTC.

There is ample precedent for treating the Cede breakdown as part of the stock ledger. Some thirty years ago, when the depository system was still new, this Court held that a stockholder was entitled to a Cede breakdown under Section 220 when the stockholder asked for a stocklist. *Hatleigh Corp. v. Lane Bryant, Inc.,* 428 A.2d 350 (Del.Ch.1981); *Giovanini v. Horizon Corp.,* 1979 WL 178568 (Del.Ch. Sept. 10, 1979). Ever since, Delaware decisions have consistently ordered the production of a Cede breakdown as part of the stocklist materials.[12] If this Court had insisted

---

12. *E.g., Berger v. Pubco Corp.,* 2008 WL 4173860, at *3 (Del.Ch. Sept., 2008); *Wynnefield Partners Small Cap Value, L.P. v. Niagara Corp.,* 2006 WL 2521434, at *2 (Del. Ch. Aug. 9, 2006); *Environmental Diagnostics, Inc. v. Disease Detection Intern., Inc.,* 1988 WL

909658, at *3 (Del.Ch. July 15, 1988); *RB Associates of New Jersey, L.P. v. Gillette Co.,* 1988 WL 27731, at *2 (Del.Ch. Mar. 22, 1988) (Allen, C.); *Shamrock Associates v. Texas American Energy Corp.,* 517 A.2d 658, 661 (Del.Ch.1986); *Weiss v. Anderson, Clayton &*

on limiting stockholder status to the names appearing on the stock ledger, then the inquiry should have stopped with Cede. *See Olson*, 1985 WL 11575, at *3 ("This Court has recognized that a party entitled to a stocklist pursuant to § 220 is also entitled to a Cede breakdown even though technically Cede is the record holder on the company's books.").

Section 220 uses the same terminology as Section 219. Section 220(b) provides that a stockholder may make copies and extracts from "[t]he corporation's stock ledger, a list of its stockholders, and its other books and records." 8 *Del. C.* § 220(b). To review, Section 219(c) states that "[t]he stock ledger shall be the only evidence as to who are the stockholders entitled by this section to examine the list required by this section or to vote in person or by proxy at any meeting of stockholders." 8 *Del. C.* § 219(c). Section 219(a) requires that "[t]he officer who has charge of the stock ledger" prepare and make available prior to a meeting of stockholders "a complete list of the stockholders entitled to vote at the meeting." 8 *Del. C.* § 219(a). If a Cede breakdown is part of the stock ledger for purposes of Section 220(b), it logically should be part of the stock ledger for purposes of Section 219(c)

and should be used to create the stocklist under Section 219(a).

As a corporate law traditionalist,[13] I have reached this conclusion only after much thought. The established understanding among practitioners, evidenced by our case law, is that DTC (through Cede) is the record holder and that everyone above DTC is a beneficial holder. Having been forced by this case to delve deeply into the matter, I see the relationship between DTC and its participant banks and brokers as fundamentally different from the relationships further up the chain. I further believe that the assumptions about this first link in the ownership chain—the legislative facts[14] on which our cases historically have relied—are demonstrably incorrect.

Delaware decisions discussing DTC have frequently assumed that banks and brokers moved to the depository system for their own convenience.[15] As illustrated by the abbreviated historical background I have provided, the depository system was a necessary response to the late 1960s paperwork crisis and was embodied in a federal mandate. In adopting Section 17A(e) of the Exchange Act, Congress directed the SEC to "use its authority . . . to

---

*Co.*, 1986 WL 5970, at *4 (Del.Ch. May 22, 1986).

**13.** I borrow this moniker from Vice Chancellor Strine. *See* Leo E. Strine, Jr., *Towards A True Corporate Republic: A Traditionalist Response To Bebchuk's Solution For Improving Corporate America*, 119 Harv. L.Rev. 1759, 1762–64 (2006). Like my colleague, I strive to be an "open-minded corporate law 'traditionalist.'" *Id.* at 1759.

**14.** This term refers to the empirical assumptions about the world that courts necessarily make when deciding cases. *See In re Oracle Corp. Deriv. Litig.*, 824 A.2d 917, 940 (Del.Ch. 2003) (employing concept and citing Kenneth Culp Davis, *An Approach to Problems of Evi-*

*dence in the Administrative Process*, 55 Harv. L.Rev. 364, 402–03 (1942)); *see generally* Leo E. Strine, Jr., *The Inescapably Empirical Foundation of the Common Law of Corporations*, 27 Del. J. Corp. L. 499, 502–03 (2002) (describing concept at greater length).

**15.** *See, e.g., RB Assocs.*, 1988 WL 27731, at *3 (describing DTC system as a "mechanism of convenience for the brokerage firms"); *Olson*, 1985 WL 11575, at *3 (describing Cede as "but a name used for the convenience of the brokerage houses"); *Hatleigh*, 428 A.2d at 353 (remarking that DTC exists "for the benefit of those firms participating in the Depository Trust Company so as to simplify their stock transfer transactions on behalf of their customers").

end the physical movement of securities certificates in connection with the settlement among brokers and dealers of transactions in securities consummated by means of the mails or any means or instrumentalities of interstate commerce." 15 U.S.C. § 78q–1(e). "The immobilized jumbo certificates [held by DTC] are the direct result of Section 17A(e) of the Exchange Act. . . ." *Street Name* at 10–7 & n. 10. The initial link in the beneficial ownership chain connecting DTC to its participant banks and brokers—the only link that I address—is thus compelled by federal law. Delaware cases have looked through the record holder to the next link in the ownership chain when beneficial owners were required by law to hold through a particular record owner. *Preston v. Allison,* 650 A.2d 646, 649 (Del. 1994); *Seidman & Assocs.,* 837 A.2d at 29.

Delaware decisions likewise have assumed that the depository system yields no benefits for issuers and that Delaware corporations therefore need not concern themselves with the relationship between DTC and its participant members.[16] The depository system is what enables public trading of securities to take place. In 2009, the NYSE reported average *daily* volume of approximately 3 *billion* shares and approximately 11 *million* separate trades. *See* NYSE Factbook, http://www.nysedata.com/factbook (last visited January 30, 2010). The failure of registered transfers to keep up with much lower trading volumes in the 1960s demonstrates that such a system cannot meet current demand. *Prefatory Note* at 2. Without immobilization and DTC ownership, "implementing a system to settle securities

within five business days (T + 5), much less today's norm of T + 3 or the current goal of T + 1 or T + 0, would simply be impossible." *Hanging Chads* at 1238. Issuers could not undertake an initial public offering or otherwise access the equity markets without depository ownership. Being able to raise capital through the public markets would seem an obvious benefit to issuers. Given that Delaware corporations obtain significant benefits from having banks and brokers consolidate their shares at DTC, it seems reasonable to require Delaware corporations to take into account the nature of the relationship between DTC and its participant members.

Most significant to my mind are the concerns expressed in our decisions about the uncertainty and practical difficulties a Delaware corporation would face in identifying its stockholders if asked to look beyond the stock ledger. For DTC and its participant banks and brokers—again the only level that I address—this is not a problem. Federal regulations require DTC to "furnish a securities position listing [*i.e.,* the Cede breakdown] promptly to each issuer whose securities are held in the name of the clearing agency of its nominee." 17 C.F.R. § 240.17Ad–8(b). A Delaware corporation that sees Cede on its stock ledger can obtain a Cede breakdown with ease. In 1981, this Court noted that a Cede breakdown could be obtained in a matter of minutes. *Hatleigh,* 428 A.2d at 354. A Cede breakdown can now be obtained through DTC's website or by calling the DTC "Proxy Services Hotline." The cover pages for the two Cede breakdowns in the record state, "Security Position Re-

---

16. *See, e.g., Enstar,* 535 A.2d at 1353 n. 2 ("Whether a beneficial stockholder participates in a depository system is a matter between the beneficial stockholder and his broker, and is not a consideration for issuers."); *Wynnefield Partners,* 2006 WL 1737862, at *3

(quoting *Enstar*), *rev'd on other grounds,* 907 A.2d 146 (Del.2006); *American Hardware,* 136 A.2d at 692 ("If an owner of stock chooses to register his shares in the name of a nominee, he takes the risks attendant upon such an arrangement. . . .").

ports—Now Available Via The Web." They describe the "convenient report delivery options including browser and spreadsheet download" that "bring[ ] your shareholders to your desktop." As discussed above, listed Delaware corporations already get a Cede breakdown as a necessary part of preparing for a meeting of stockholders or consent solicitation because of federal regulations governing the distribution of voting cards and solicitation materials. The American Bar Association's *Handbook for the Conduct of Shareholders' Meetings* currently identifies "lists of holders obtained from depositories" as one of the documents that can be relied on in "determining the shares entitled to vote and tabulating the vote." Handbook for the Conduct of Shareholders' Meetings 40 (ABA Business Law Section, Corporate Governance Committee ed., 2000).

I therefore do not believe that there are any practical or policy-based impediments to treating the Cede breakdown as part of the stock ledger. As I have already noted, many Delaware corporations currently outsource their stock ledger to transfer agents. For these corporations, determining whether a holder appears on the stock ledger is already a matter of reaching outside the corporation and asking for the information. A corporation can readily do the same with the Cede breakdown. Easy access to the Cede breakdown fully addresses any concerns about efficiency, certainty, and predictability of application. These factors therefore cannot outweigh, in my mind, the policy of protecting against stockholder disenfranchisement.

My ruling does not alter the traditional distinction between record and beneficial ownership. The analysis I have followed does not apply to any entity other than DTC in its role as a federally registered clearing agency. The view from the top of the beneficial ownership chain remains as always: beneficial holders are not record holders.

Two obvious questions are raised by this holding. First, what happens to Cede? Just as federal law recognizes that DTC occupies a distinct role as a clearing agency, I believe Delaware can accommodate Cede's continuing appearance on the stock ledger. Our decisions already acknowledge Cede as the nominee of DTC. We can just as easily recognize that Cede is the nominee of DTC acting on behalf of its participant member banks and brokers. Beneficial holders will simply have an alternative. They can either act through Cede, as they do now, or they can act through a bank or broker that appears on the Cede breakdown. The same flexibility is available to corporations, who can continue to take advantage of the administrative role DTC plays in matters like the distribution of dividends, or choose to deal directly with the banks and brokers who appear on the Cede breakdown. In some circumstances, Delaware corporations should benefit from looking through DTC to the holdings of the participant banks and brokers. Reducing the number of shares available for appraisal arbitrage is one area that springs to mind. *See Transkaryotic*, 2007 WL 1378345, at *3–4 (declining under present law to look behind the 16 million shares of stock not voted by Cede in favor of a merger to determine whether hedge funds could seek appraisal for 11 million shares).

Second, what happens under other provisions of the DGCL? Although it will require future cases to work through particular issues, I do not foresee any headaches. Because of the requirements of the federal securities laws, publicly traded Delaware corporations already send notices of stockholder meetings to DTC-participant banks and brokers and through them to the ultimate beneficial

holders. Section 220 was amended in 2003 to permit ultimate beneficial holders to seek books and records. 8 *Del. C.* § 220(a). Section 262 was amended in 2007 to permit ultimate beneficial holders to pursue an appraisal proceeding, although the demand still must come from a record holder. 8 *Del. C.* §§ 262(a) & (e). For other sections, treating the banks and brokers on the Cede breakdown as record holders should enhance the legitimacy of our law. For purposes of counting stockholders of record to determine whether Section 203 applies, it seems more consistent with the protective purposes of that provision to count banks and brokers as individual stockholders, rather than to treat Cede, which by itself potentially represents a majority of the outstanding shares, as a single monolithic block. 8 *Del. C.* § 203(b)(4). The same is true for the exception to transactions triggering appraisal rights under 8 *Del. C.* § 262(b)(2)(b). I do not pretend to have foreseen all the ramifications. Judges, like all mortals, see through a glass, darkly. But for those sections and matters that I have contemplated, the consequences of treating the banks and brokers on the Cede breakdown as record owners appear to range from neutral to beneficial.

I therefore conclude that the Cede breakdown showing the banks and brokers who held EMAK stock at DTC as of October 22, 2009, was part of EMAK's stock ledger for purposes of Section 219(c). Those banks and brokers were therefore stockholders of record entitled to express consent to corporate action without a meeting under Section 228(a). Accordingly, the Broadridge omnibus consents validly voted the shares held by those banks and brokers, without the need for a DTC omnibus proxy.

d. **The Incorrect Record Date On The Broadridge Omnibus Consents Does Not Affect Their Validity.**

■ In their final challenge to the validity of the Broadridge omnibus consents, the defendants point out that both reference a record date of October 12, 2009, rather than the actual record date of October 22. This is not a valid objection.

Section 228 does not require a written consent to reflect a record date. 8 *Del. C.* § 228. Section 228(c) provides that "[e]very written consent shall bear the date of signature of each stockholder ... who signs the consent." 8 *Del. C.* § 228(c). This is the only date referenced in the statute. This date is used to determine whether the consent was expressed "within 60 days of the earliest dated consent delivered" in the manner required by the statute. 8 *Del. C.* § 228(c).

The record date established under Section 213 determines the number of shares a holder can vote through action by written consent, not some other date annotated on the consent itself. In tabulating votes, the task is to compare the number of shares voted by the holder executing the consent with the number of shares held on the record date. As described in the Factual Background, *supra*, the established practice is to record the full number of votes if the consent expresses votes equal to or less than the number of shares held of record. If the consent attempts to vote greater than the number of shares held on the record date, then the inspectors (and if challenged, this Court) must resolve the overvote. Absent conflicting consents or proxies, the overvote is carved back to vote the number of shares held of record as of the record date. There is no challenge to the validity of this practice, which is supported by our law. *Chappel v. Standard Scale & Supply Corp.*, 138 A. 74, 76 (Del. Ch.1927), *rev'd on other grounds,* 141 A.

191 (Del.1928); *see Concord Fin. Group, Inc. v. Tri–State Motor Transit Co.,* 567 A.2d 1, 16–17 (Del.Ch.1989) (citing *Chappel* with approval but declining to apply it because of a conflict between proxies); *see also* 8 *Del. C.* § 231(d) (authorizing inspectors of election to consult "other reliable evidence" to resolve overvotes). What matters is that whether a consent reflects an improper proper record date does not alter how the votes are counted.

The defendants contend that unless the Broadridge omnibus consents reflected the correct record date, "it cannot be ascertained whether the total number of shares for each account in the Broadridge [consent] was correct as of the record date." To the contrary, the Cede breakdown as of October 22, 2009, shows the number of shares held by each bank and broker whose shares were voted by the Broadridge omnibus consents. The defendants also argue that "when a Broadridge proxy is dated before the actual record date, it is entirely possible that some of the consents signed by the ultimate beneficial holders were signed *before* the record date, and are thus older than the 60–day limit provided by 8 *Del. C.* § 228." The ultimate beneficial holders do not sign consents. They give voting instructions. *Street Name* at 10–14. "Beneficial owners merely have the right to instruct how their shares are to be voted by Broadridge...." *Id.* The shares actually were voted by the Initial Broadridge Omnibus Consent and the Supplemental Broadridge Omnibus Consent. Neither was stale.

I therefore hold that the appearance on the Broadridge omnibus consents of an incorrect record did not undermine their validity. What mattered for Section 228 was the date on which the Broadridge omnibus consents were expressed.

## 2. Kurz Properly Voted The Boutros Shares.

The next set of challenges to the TBE Consents concerns the voting of Boutros's shares. I reject the defendants' charge of illegal vote buying, finding that the Purchase Agreement transferred to Kurz the full economic risk associated with the Boutros shares and that the voting rights appropriately followed the economic interest. I conclude that the Purchase Agreement did not violate the transfer restrictions governing Boutros's shares. I also determine that although Boutros or EMAK may theoretically have some form of claim against Kurz, it is a claim properly remedied by an award of money damages (although I cannot perceive that any monetary harm was suffered by anyone), not by invalidating votes.

### a. Kurz Did Not Engage In Illegal Vote Buying.

"Vote buying" is an incendiary phrase. For citizens steeped in the democratic values of our American republic, a charge of "vote buying" carries connotations of bribery and corruption. But as this Court first recognized *Schreiber v. Carney,* 447 A.2d 17 (Del.Ch.1982), and as Chancellor Allen further elucidated in *Kass v. Eastern Air Lines, Inc.,* 1986 WL 13008 (Del.Ch. Nov.14, 1986), the normative principles that make vote buying anathema in the political context do not translate well into the corporate realm.[17] Scholars have explored these differences at length.[18]

---

**17.** *Kass* involved a bondholder vote under the terms of the governing indentures. Chancellor Allen regarded the analogy between bondholder and stockholder voting as "close," and I believe the principles he outlined in *Kass* apply fully in the latter context. *See* 1986 WL 13008, at *2–4.

**18.** *See, e.g.,* Robert B Thompson & Paul H. Edelman, *Corporate Voting,* 62 Vand. L.Rev.

■ Kurz's actions do not involve the problem of insiders using corporate resources to "buy" votes. *See Portnoy v. Cryo–Cell International, Inc.*, 940 A.2d 43, 73–74 (Del.Ch.2008); *Hewlett v. Hewlett–Packard Co.*, 2002 WL 549137, at *4–7 (Del.Ch. Apr. 8, 2002); *Kass*, 1986 WL 13008, at *2–4; *Schreiber*, 447 A.2d at 22–23. Although Kurz is a director of EMAK, he used his own resources to acquire Boutros's shares. In making the decision to purchase, he did not take advantage of any inside information, a point I return to when discussing the defendants' allegations of insider trading. As described in the Factual Background, *supra*, what prompted the transaction was the D.F. King report on Friday, December 18, 2009, showing TBE with consents for approximately 48.4% of the common shares and needing another 116,325 votes to win. Kurz did not have any inside information from EMAK about the likely voting results. A case in which a fiduciary receives inside information about how a vote is trending and then acts on the information to swing a close vote using his own resources would present different equities and could be analyzed within the framework of *Portnoy*, *Hewlett–Packard*, and *Schreiber*.

Vote-buying that does not involve use of corporate resources—which I will call "third party vote buying"—is an undeveloped area of our law. Although *dictum* in *Hewlett–Packard* could be read to suggest that there are no restrictions on the buying or selling of votes when corporate resources are not involved, I do not believe that was what Chancellor Chandler intended. *See Hewlett–Packard*, 2002 WL 549137, at *4 ("Shareholders are free to do whatever they want with their votes, including selling them to the highest bidder."). Elsewhere in the *Hewlett–Packard* decision, Chancellor Chandler noted that "the principle that vote-buying is illegal *per se* if entered into for deleterious purposes survives." *Id.* at *4 n. 5. Recent scholarship has cast light on shadowy aspects of the voting process and techniques by which voting rights can be manipulated.[19] I regard the concept of vote buying as broad enough to encompass these practices. When they prove deleterious to stockholder voting, this Court can and should provide a remedy.

■ Although the full measure of principles that will govern third-party vote buying must await case-by-case development through the common law method, several broad concepts can be identified. As recognized by *Schreiber*, third-party

129, 130–138 (2009) (hereinafter *"Corporate Voting"*); Saul Levmore, *Voting With Intensity*, 53 Stan. L.Rev. 111, 136–39 (2000); Thomas J. Andre, Jr., *A Preliminary Inquiry Into The Utility Of Vote Buying In The Market For Corporate Control*, 63 S. Cal. L.Rev. 533, 540–86 (1990); Richard L. Hasen, *Vote Buying*, 88 Cal. L.Rev. 1323, 1324–37 (1990); *see generally* Robert Charles Clark, *Vote Buying and Corporate Law*, 29 Case W. Res. L.Rev. 776 (1979); Henry G. Manne, *Some Theoretical Aspects Of Share Voting*, 64 Colum. L.Rev. 1427 (1964).

**19.** *See, e.g.,* Henry T.C. Hu & Bernard Black, *Equity and Debt Decoupling and Empty Voting II: Importance and Extensions*, 156 U. Pa.

L.Rev. 625 (2008) (hereinafter, *"Decoupling"*); Marcel Kahan & Edward B. Rock, *Hedge Funds In Corporate Governance And Corporate Control*, 155 U. Pa. L.Rev. 1021 (2007); Henry T.C. Hu & Bernard Black, *Empty Voting and Hidden (Morphable) Ownership: Taxonomy, Implications, and Reforms*, 61 Bus. Law. 1011 (2006) (hereinafter, *"Empty Voting"*); Shaun Martin & Frank Partnoy, *Encumbered Shares*, 2005 U. Ill. L.Rev. 775. The foregoing articles convey a sense of concern about the decoupling of economic interests from voting rights. For a more positive assessment, see Onnig H. Dombalagian, *Can Borrowing Shares Vindicate Shareholder Primacy?*, 42 U.C. Davis L.Rev. 1231 (2009).

vote buying should merit review only if it is disenfranchising, in the sense of actually affecting the outcome of the vote. 447 A.2d at 25–26. Vote buying is disenfranchising when it delivers the swing votes. *Hewlett–Packard*, 2002 WL 549137, at *5. Vote buying is also disenfranchising if it alters the voting pattern in a critical way, such as through coercive tactics reminiscent of tender offer strategies from pre-Williams Act days. *See Empty Voting* at 1055–56 (describing potential for coercion in sale of votes).

■ Equally important, and again drawing on *Schreiber*, a vote-buying arrangement must not be the product of fraud. *Schreiber*, 447 A.2d at 25–26. Because of the potential for abuse inherent in vote-buying transactions, our law should be particularly sensitive to informational disparities and the importance of disclosure where votes are concerned. For example, disaggregated shareholders rationally de-value their votes when it appears they do not have control implications. A party seeking to aggregate votes into a meaningful block could take advantage of the rational pricing expectations of disaggregated stockholders who did not know such an effort was underway. Douglas A. Cole, *E–Proxies For Sale? Corporate Vote–Buying In The Internet Age*, 76 Wash. L.Rev. 793, 837–38 (2001); Kevin C. Cunningham, *Note: Examination Of Judicial Policy On Corporate Vote Buying In The Context Of Modern Financial In-*

*struments*, 64 N.Y.U. Ann. Survey Am. L. 293, 306–08 (2008).

■ Moving beyond *Schreiber*, Delaware decisions have exhibited consistent concern about transactions that create a misalignment between the voting interest and the economic interest. As then Vice chancellor now Chief Justice Steele explained, "[g]enerally speaking, courts closely scrutinize vote-buying because a shareholder who divorces property interest from voting interest[ ] fails to serve the 'community of interest' among all shareholders, since the 'bought' shareholder votes may not reflect the rational, economic self-interest arguably common to all shareholders." *In re IXC Comm's, Inc. S'holders Litig.*, 1999 WL 1009174, at *8 (Del.Ch. Oct. 27, 1999).[20] What legitimizes the stockholder vote as a decision-making mechanism is the premise that stockholders with economic ownership are expressing their collective view as to whether a particular course of action serves the corporate goal of stockholder wealth maximization. Policing third-party vote buying does not rest on the outdated notion that every stockholder owes every other stockholder a duty to use its best judgment while voting. *See Schreiber*, 447 A.2d at 24–25 (rejecting notion of stockholder duty *inter se*). It flows instead from the legitimating conditions necessary for meaningful stockholder voting, which also include the absence of coercion and the presence

---

**20.** For other cases articulating this principle, see *Len v. Fuller*, 1997 WL 305833, at *4 (Del.Ch. May 30, 1997) (Allen, C.) ("The vote ordinarily appended to common stock is generally thought to represent a necessary protection because the common stock represents the provision of long-term capital to the enterprise without contractual protection of any repayment or interest obligation. It is most efficient to grant the common stock the right to designate the board because of its status as the owner of the residual value of the firm.");

*Haft v. Haft*, 671 A.2d 413, 421 (Del.Ch.1995) (Allen, C.) ("A powerful argument can be advanced that generally the congruence of the right to vote and the residual rights of ownership will tend towards efficient wealth production."); *Commonwealth Assocs. v. Providence Health Care*, 641 A.2d 155, 157 (Del.Ch. 1993) (Allen, C.) (noting law's historic concern about "the sale of votes unconnected to the sale of stock" in part because "such sales misalign the interests of voters and the interests of the residual corporate risk bearers").

of full information about the material facts.[21]

Concern about the underlying economic interests of stockholders can be seen in multiple strands of our law. It animates the default rule of one share, one vote. 8 *Del. C.* § 212(a). It surfaces in cases addressing the staleness of a record date. *See In re The MONY Group, Inc. S'holder Litig.,* 853 A.2d 661, 672 (Del.Ch.2004) (approving resetting of stale record date); *Bryan v. Western Pac. R. Corp.,* 35 A.2d 909, 913–15 (Del.Ch.1944) (enjoining meeting of stockholders where closing of transfer books had effect equivalent to eight-month stale record date). It is embedded in provisions of Section 203 that exclude interested shares from the statutory votes to validate a transaction with an interested stockholder. 8 *Del. C.* § 203(a)(2) & (a)(3). It justifies majority-of-the-minority votes and the judicially imposed requirement, not found in 8 *Del. C.* § 144(a)(2), that the statutory vote called for by that section come from disinterested shares. *Marciano v. Nakash,* 535 A.2d 400, 404–05 (Del. 1987); *Fliegler v. Lawrence,* 361 A.2d 218, 221–22 (Del.1976). It is reflected in the matters on which stockholders vote, which generally involve fundamental transactions that could alter their stake, role, or rights in the corporation. *E.g.,* 8 Del. C. §§ 109(a), 251, 272, 279 & 280. And stockholders of course elect directors, who are statutorily empowered to manage the business and affairs of the corporation in accordance with their fiduciary duties. 8 *Del. C.* § 141(a); *Blasius,* 564 A.2d at 659 ("The shareholder franchise is the ideological underpinning upon which the legitimacy of directorial power rests."). A Delaware public policy of guarding against the decoupling of economic ownership from voting power can be seen in the 2009 amendment to Section 213(a), which now authorizes a board to set one record date for purposes of giving notice of a meeting of stockholders and a second, later record date for determining which stockholders can vote at the meeting. 8 *Del. C.* § 213(a).

These principles are not undermined by Section 218 of the DGCL, which authorizes voting trusts and voting agreements. 8 *Del. C.* § 218. In a voting trust, stockholders pool their votes, maintaining the alignment between ownership and voting rights. 8 *Del. C.* § 218(a). Through a voting agreement, stockholders may agree that "the shares held by them shall be voted as provided by that agreement, or as the parties may agree, or as determined in accordance with a procedure agreed upon by them." 8 *Del. C.* § 218(c). Consistent with the assumption that stockholders act rationally to maximize the value of their shares, Section 218(c) recognizes that stockholders may reach agreements about how to vote. Entry into such an agreement implies a judgment that it will best

---

**21.** *See generally Corporate Voting* at 144–52 (discussing theories of shareholder voting and arguing that shareholders vote because they are uniquely positioned to respond to changes in the stock price, which the authors view as the best available indicator of whether directors are acting in the best interests of the corporation); *Decoupling* at 632–633, 737 (discussing legitimating role of linking ownership interest to voting power); *Empty Voting* at 1014 ("The deference that courts pay to shareholder votes is premised on the belief that shareholders have an economic interest in increasing share value and will vote to further that interest. Beyond the instrumental role of voting, Delaware courts treat the concept of shareholder-as-owner-and-voter as the core ideological basis for managerial exercise of authority over property the managers do not own."); Cunningham, *supra,* at 303–05 (describing "Classic Theory of Corporate Voting Rights" in which shareholders receive voting rights because as the residual claimants they have the proper incentives to make optimal decisions to maximize firm value).

maximize share value. *Cf. Haft*, 671 A.2d at 421 (drawing parallel inference from grant of proxy). Nothing in Section 218 states or implies that every voting trust or voting agreement is valid, and nothing in Section 218 speaks to arrangements producing voting incentives directly contrary to ownership interests. Section 218 does not limit this Court's equitable powers to address deleterious practices. *Schnell v. Chris-Craft Indus., Inc.*, 285 A.2d 437, 439 (Del.1971) ("[I]nequitable action does not become permissible simply because it is legally possible.").

■ These principles also do not conflict with the venerable maxim that stockholders can choose freely whether and how to vote, and may do so for any reason including "for personal profit, or determined by whims or caprice." *Ringling Bros.-Barnum & Bailey Combined Shows v. Ringling*, 53 A.2d 441, 447 (Del.1947). The premise underlying that freedom is the alignment of economic interests and voting rights. The *Ringling* court ruled at a time when economic interests and voting rights were inextricably linked. As late as 1983, Judge Frank Easterbrook and Professor Daniel Fischel could state plausibly that "[i]t is not possible to separate the voting right from the equity interest" and that "[s]omeone who wants to buy a vote must buy the stock too." Frank H. Easterbrook & Daniel R. Fischel, *Voting in Corporate Law*, 26 J.L. & Econ. 395, 410 (1983). After the derivatives revolution, that is no longer true.

■ Because transactions in which economic interests are fully aligned with voting rights do not raise concern, Delaware law does not restrict a soliciting party from buying shares and getting a proxy to bolster the solicitation's chance of success. Delaware law presumes that in the sale of the underlying stock, the seller sells and assigns all of its rights, title and inter-est, "including its right to grant a consent or revocation with respect to a past record date." *Commonwealth Assocs.*, 641 A.2d at 158. Delaware law further presumes that "upon request the seller will, in good faith, take such ministerial steps as are necessary (e.g., granting proxies) to effectuate the transfer." *Id.* Such transactions are common. *Street Name* at 10-26 ("[O]ver the course of a proxy contest, it is not uncommon for contestants to attempt to increase their voting power by purchasing additional shares...."); *Corporate Voting*, at 130 ("A corporate voter who has intense feelings about the matter to be determined can influence, if not control, the outcome by purchasing shares.").

Applying these principles to the current case, I have no difficulty concluding that the Purchase Agreement was potentially disenfranchising and hence should be subjected to a vote buying analysis. The Purchase Agreement provided TBE with the votes they needed to prevail and disenfranchised what would have been a silent majority against the TBE Consent Solicitation. The Purchase Agreement therefore should be examined closely.

I find no evidence of fraud in the transaction. The record indicates that Boutros was fully informed about the ongoing consent solicitations. Both factions had made multiple attempts to get him to commit to their side. Although there is no direct evidence establishing that Boutros knew his shares were the swing shares, I conclude that he must have been cognizant of this fact. He cut his deal with Kurz over the weekend before the Monday on which the TBE Consent Solicitation ended. At a time when EMAK's stock was trading on the pink sheets for less than a dollar, Boutros asked for $2.25 per share and received $1.50 per share. Boutros was advised by counsel and bargained to obtain specific terms for the deal, including an

absence of representations and warranties and contractual indemnification from Kurz. These are the hallmarks of a transaction in which Boutros understood what he was selling, the circumstances under which he was selling it, and what he was getting in return.

This brings me to the alignment of interests. Although Kurz did not take title to the 150,000 shares that Boutros owned, and although I assume the Restricted Stock Grant Agreement prohibits Boutros from transferring title to Kurz until March 3, 2011, Boutros nevertheless transferred to Kurz, and Kurz now bears, 100% of the economic risk from the 150,000 shares. If the value of EMAK's shares drops further, then Kurz will suffer. If EMAK goes bankrupt and its shares become worthless, then Kurz will have a paper souvenir. Conversely, if EMAK turns itself around and prospers, then Kurz will benefit. Kurz has already paid Boutros. Kurz's only interest lies in how EMAK performs.

Because Kurz now holds the economic interest in the shares, Delaware law presumes that he should and will exercise the right to vote. *Commonwealth Assocs.*, 641 A.2d at 158; *see Len*, 1997 WL 305833, at *5 (barring record holder from voting shares by written consent after corporation exercised option to acquire shares); *Freeman*, 1985 WL 11583, *7 ("[I]t would be inequitable to allow a holder of record who holds mere legal title to stock to act by consent in a manner contrary to the wishes of the true owner."). The proxy Boutros granted to Kurz under the Purchase Agreement comports with what our law expects. *See generally Street Name* at 10–27 (explaining that a purchaser typically obtains an irrevocable proxy when shares are acquired from a registered holder).

Equally important, Kurz does not have any competing economic or personal in- terests that might create an overall nega- tive economic ownership in EMAK. Ex- cluding the interests he acquired from Boutros, Kurz holds 1,420,272 common shares, a block that historically represent- ed a sizable portion of his personal wealth. Even with the stock trading around the one dollar mark, Kurz's shares comprise a meaningful economic stake. Kurz has no countervailing short interest; he is overwhelming long EMAK's stock. Although Crown has suggested that Kurz seeks only to obtain a high-paying CEO position, Kurz testified that he expected his compensation to be similar to the in- cumbent CEO's. Moreover, it will be the Board, not Kurz unilaterally, who ulti- mately will decide whether Kurz is hired and how he is compensated. If fiduciary duties are breached when that decision is made, this Court can provide a remedy. I do not believe that Kurz has any reason to vote other than in the manner he thinks would best maximize the value of EMAK as a corporation.

I therefore conclude that the voting of the Boutros shares is not a legal wrong. I agree with the defendants that Kurz pri- marily wanted the voting rights carried by the shares, not the shares themselves. Unlike the defendants, I do not perceive anything illicit in that fact given the nature of the transaction as a whole. *Common- wealth Assocs.*, 641 A.2d at 158 (upholding share purchases "in the heat of a consent solicitation battle" where the exercise of the voting rights "supplied the entire rea- son for the purchase").

**b. The Purchase Agreement Does Not Violate The Restricted Stock Grant Agreement.**

The defendants next argue that Kurz should not be allowed to vote the Boutros shares because Boutros breached the transfer restrictions in the Restricted Stock Grant Agreement by entering into

the Purchase Agreement. Although the plaintiffs have raised meaningful questions about the scope and validity of those restrictions, I assume the restrictions are operative and binding. I conclude that Kurz and Boutros successfully contracted around them.

The Restricted Stock Grant Agreement provided that "[p]rior to [March 3, 2011], [Boutros] shall not be entitled to transfer, sell, pledge, hypothecate or assign any shares of Restricted Stock." The Restricted Stock Grant Agreement does not prohibit Boutros from agreeing to take those actions at a future date. A restriction on transfer and an restriction on any agreement to transfer are two different restrictions. *See* 8 *Del. C.* § 203(c)(9) (defining "owner" of stock as a person who, among other triggers, "[b]eneficially owns such stock, directly or indirectly" or has "the right to acquire such stock").

The Restricted Stock Grant Agreement could have been drafted differently. It could have paralleled the Resale Restriction Agreement, which barred any "contract to sell," any "option to purchase," and any transfer of the "economic risk of ownership." It could have been drafted to incorporate expansive concepts like those used in defining beneficial ownership under the Securities Exchange Act of 1934. *E.g.,* 17 C.F.R. § 240.13d–3. It could have used the equally expansive definitions found in Section 203 of the DGCL. All of the parties agree that Kurz would be deemed to own the Boutros shares under those broad definitions.

Instead, EMAK used a narrower definition. Corporate insiders rationally prefer a narrower restriction triggered only by actual transfer, rather than a broader restriction that encompasses agreements to transfer, because the narrower version permits executives to use derivative contracts to hedge their economic risk. *See*

*Empty Voting* at 1016, 1026–27, 1068–69 (describing executives' incentives to mitigate economic exposure to equity ownership in their firms and related hedging techniques used to reduce exposure). Here, that flexibility worked to the incumbents' disadvantage in the TBE Consent Solicitation.

I therefore conclude Boutros did not violate the transfer restrictions in the Restricted Stock Grant Agreement by entering into the Purchase Agreement. I have no occasion to consider the relief that might arise from such a violation.

### c. The Insider Trading Issues Do Not Merit Invalidating The Votes From The Boutros Shares.

The defendants finally contend that Kurz should not be permitted to vote the Boutros shares because by entering into the Purchase Agreement, Kurz engaged in insider trading and violated EMAK's insider trading policy. It is undisputed that during a Board meeting on December 9, 2009, Kurz and other directors were provided with confidential, non-public financial results and forecasts indicating that EMAK's performance would continue to deteriorate. The results and forecasts themselves are not part of the record. EMAK had an insider trading policy that prohibits directors from trading during quiet periods, defined as the last ten days before the end of a quarter. It is undisputed that the Purchase Agreement was entered into during a quiet period.

Kurz testified that he did not believe he was trading on inside information when he entered into the Purchase Agreement because the financial results and forecasts he received suggested at most that he was overpaying Boutros for his shares. Kurz also testified that although he implemented the insider trading policy when he was EMAK's CEO, a position from which he

resigned in 2005, he did not know that the policy was still in effect when he rejoined the Board in May 2009. He testified that no one mentioned it to him or gave him a copy, and he knew that the EMAK's shares had been deregistered. I credit this testimony. Kurz bought Boutros's shares because TBE needed another 116,325 votes to win.

I do not believe the defendants can use the insider trading theory or the violation of EMAK's insider trading policy to invalidate the votes from the Boutros shares. Both appear to be at most theoretical and highly technical violations. Both seem best remedied by an award of monetary damages, although I am hard pressed to imagine what damages either EMAK or Boutros could recover. The quiet periods established by the insider trading policy are designed to protect a registered public company from exposure to securities law claims relating to the reporting of quarterly results. Kurz's unintended violation of that policy does not implicate those interests.

The EMAK incumbents whose positions are threatened by the TBE Consent Solicitation should not be able to wield thin allegations of insider trading or a technical violation of EMAK's insider trading policy to protect their positions. The defendants have not cited any precedent in support of such an effort. I decline to invalidate the votes from the Boutros shares on either basis.

### 3. The Defendants Have Not Identified Any Actionable Disclosure Violations.

 The last challenge to the TBE Consents asserts disclosure violations. "[D]irectors of Delaware corporations are under a fiduciary duty to disclose fully and fairly all material information within the board's control when it seeks shareholder action." *Stroud v. Grace,* 606 A.2d 75, 84 (Del.1992). The duty of disclosure applies to directors who solicit written consents. *Zaucha v. Brody,* 1997 WL 305841, at *5 (Del.Ch.), *aff'd,* 697 A.2d 749 (Del.1997); *see Unanue v. Unanue,* 2004 WL 2521292, *10 (Del.Ch. Nov.3, 2004) (applying duty). The duty exists regardless of whether a corporation is registered and publicly traded, dark and delisted, or closely held. *Cf. Unanue,* 2004 WL 2521292, *9 (questioning whether duty should exist in non-public company but declining to reach issue). What changes is not the underlying duty but rather the context-dependent analysis of what information is material. Factors such as the nature of the corporation and its business, the information already available to stockholders, the other information being provided in the solicitation, and the type of action being solicited all affect the determination of materiality.

In the pleadings and pre-trial briefing, the defendants presented a potpourri of disclosure claims. At trial, the plaintiffs established that all of the allegedly omitted or misrepresented items were part of the total mix of information available to the EMAK stockholders. The lone exception was the defendants' claim that the TBE Consent Solicitation materials failed to disclose that plaintiffs' counsel were retained on contingency and planned to make a fee application to the Court.

 According to the defendants, Kurz's failure to disclose his arrangement with plaintiffs' counsel rendered materially misleading a statement in TBE's letter to stockholders dated October 19, 2009, to the effect that TBE was "seeking recovery directly from the directors, and not from your company." The defendants also contend that a reasonable EMAK stockholder would have viewed it as material that plaintiffs likely would seek reimbursement

of their consent solicitation expenses if they were successful.

I find the defendants' argument unpersuasive. The disclosures and omissions defendants attack were made in the midst of the contested consent solicitation that will determine the leadership and direction of a troubled, delisted, and deregistered company. Neither side approached the consent solicitation process with the rigor called for by Rule 14A. The competing consent materials amount to a series of fight letters, without the underlying floor of information that a Rule 14A solicitation statement provides. Neither side pulled any punches in describing their opponents or the dire consequences that allegedly would result if they prevailed. Both sides spoke of the significant costs imposed on EMAK by the battle for control. Shareholders were certainly aware of these costs. The defendants for their own part did not see fit to disclose their own arrangements with counsel or whether the corporation was paying.

I am also influenced by a series of other factors. First, plaintiffs' counsel was engaged on a contingent basis to challenge the Exchange Transaction. Any fee application will not depend on the outcome of the TBE Consent Solicitation. Second, under *Sugarland Industries, Inc. v. Thomas*, 420 A.2d 142 (Del.1980), plaintiffs' counsel can apply for a fee award regardless of whether they were hired on contingency. Contingent risk is but one factor in determining the amount of the award. *Id.* at 149. Third, the amount of any fee is not within the plaintiffs' control. It is

rather up to the Court. Fourth, I do not rule out the possibility that if EMAK is ordered to pay a fee award based on the rescission of the Exchange Transaction, and if the defendants are later held liable for breaches of the duty of loyalty, then the amount of the fee award might be factored into the judgment against the defendants to ensure that the corporation is made whole. EMAK therefore might not bear any of the cost of the plaintiffs' efforts to challenge the aborted Exchange Transaction.

For all of these reasons, I do not believe that disclosure of the plaintiffs' contingent fee arrangement or the possibility of fee reimbursement would have significantly altered the total mix of information. I decline to invalidate the TBE Consents on the basis of any alleged disclosure violation.

### III. CONCLUSION

I hold that the Crown Consents were ineffective because the Bylaw Amendments conflict with the DGCL and are therefore void. I hold that the TBE Consents validly effected corporate action. The Board consists of Deutschman, Ackerman, Kurz, Kleweno, Konig, and Sems. I have entered a partial final judgment to this effect pursuant to Rule 54(b).